FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2013 APR 18 PM 2:06

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE, FLORIDA

| | | |
|---|---|---|
| CHARLES G. BRANT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: |
| | ) | 3:13-cv-412-J-32MCR |
| | ) | |
| vs. | ) | Death Penalty Case |
| | ) | |
| JOHN PALMER, in his official capacity as | ) | |
| the Warden of Florida State Prison, | ) | |
| MICHAEL D. CREWS, in his official capacity | ) | |
| as the Secretary, Florida Department of | ) | |
| Corrections, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## COMPLAINT

### NATURE OF ACTION

1.  Plaintiff, Charles G. Brant, brings this action pursuant 42 U.S.C. § 1983, for violations

    and threatened violations of his right to be free from cruel and unusual punishment under

    the Eighth and Fourteenth Amendments to the United States Constitution.

2.  Plaintiff contends that lethal injection, as performed in Florida, unnecessarily risks

    infliction of pain and suffering and creates a substantial risk of serious harm under the

    Eighth Amendment.

3.  Plaintiff contends that Defendants, as a result of their failure to implement sound

    alternative procedures and guarantee the use of properly-trained personnel, have inflicted

    pain and torture on executed prisoners in the past, thereby unnecessarily exposing

1

Plaintiff to the risk of suffering the same fate unless Defendants adopt a humane and safe execution protocol.

4. Plaintiff contends that Defendants' continued use of a three-drug protocol (that includes vecuronium bromide and potassium chloride as the second and third drugs, respectively), when tested, available alternatives exist, establishes a substantial risk of severe pain that is substantial when compared to the known and available alternatives. Defendants have refused to adopt such alternatives in the face of these documented advantages, without any legitimate penological justification for their continued retention of the three-drug protocol.

5. Plaintiff further contends that the use of vecuronium bromide, a paralytic agent that acts as a chemical veil over the lethal injection process, disguises the pain and suffering to which they could be subjected. Plaintiff also contends that the use of potassium chloride, as administered by the Defendants in the lethal injection procedures, will subject them to excruciating pain and suffering.

6. Plaintiff seeks temporary, preliminary, and permanent injunctive relief to prevent Defendants from executing him by means of lethal injection as currently performed in Florida or any similar protocol. Plaintiff ask that Defendants be restrained from carrying out his execution until such time as they have eliminated the substantial risk of serious pain and suffering in violation of the United States Constitution.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction under 28 U.S.C. §§1331 (federal question), 1343 (civil rights violations), 28 U.S.C. §§2201 (declaratory relief), 2202 (injunctive relief) and 1367 (supplemental jurisdiction).   This action arises under the Eighth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

8. Venue is proper pursuant to 28 U.S.C. §1391 (b).

9. Plaintiff is currently incarcerated at Union Correctional Institution, 7819 NW 228th Street, Raiford, FL 32026, located in this district.  Plaintiff has been sentenced to death by means of lethal injection at Florida State Prison, 7819 NW 228th Street, Raiford, FL 32026, also located in this district under the direction of Defendant Warden Palmer.

10. In addition to the Plaintiff and Defendant Warden Palmer being located in this district, all executions conducted by the Florida Department of Corrections occur at Florida State Prison, therefore, "a substantial part of the events or omissions giving rise to the claim" will occur in this district.  28 U.S.C. § 1391(b).

11. Declaratory relief is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

12. Temporary, preliminary, and permanent injunctive relief is sought pursuant to Rule 65, Federal Rules of Civil Procedure.

**PARTIES**

13. Plaintiff is a resident of the State of Florida.  Plaintiff is currently a death-sentenced inmate at Union Correctional Institution in Raiford, Florida, and is in the custody of Defendant Crews, Secretary, Florida Department of Corrections.

14. Defendant John Palmer is the Warden of Florida State Prison. As such, he is responsible for all executions and for the administration of lethal injection for the Florida Department of Corrections. He is sued in his official capacity.

15. Defendant Michael D. Crews is the Secretary of the Florida Department of Corrections (FDOC). As such, he is responsible for the creation and enforcement of policies and procedures generally applicable to all prisons and all prisoners, including the procedures and protocols related to executions by lethal injection. He is sued in his official capacity.

16. At all times relevant to this action, Defendants act under color of state law and their actions constitute state action.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17. Plaintiff does not believe that exhaustion is necessary under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997(e), because this suit does not challenge prison conditions and because there are no available administrative remedies that could address the challenged constitutional violations.

18. However, Plaintiff has exhausted his administrative remedies. Grievances and Responses attached as Exhibit A.

## GENERAL ALLEGATIONS

19. Under Florida law, a death sentence is to be "executed by lethal injection...under the direction of the Secretary of Corrections or the secretary's designee." Fl. Stat. 922.105(1).

20. The capital sentencing statute does not prescribe specific drugs, drug suppliers, dosages, drug combinations, or the manner of intravenous line access to be used in the execution

process, nor does the statute require any certification, training, or licensure of those who participate in the execution process.

21. All of the details of the execution process are to be determined by the Defendant Secretary and are specifically exempt from Florida's Administrative Procedures Act. Fl. Stat. 922.105(7).

22. Defendants intend to execute Plaintiff using the Execution by Lethal Injection Procedures, which are effective for all executions after September 4, 2012 (hereinafter "2012 Protocol"). The previous protocol from June 8, 2011 was created in response to the nationwide shortage of sodium pentothal and substituted pentobarbital for sodium pentothal as the first drug in the three-drug procedure. There are two substantial differences between the 2012 protocol and prior protocols. First is the substitution of vecuronium bromide for pancuronium bromide. Second is the continued call for administration of pentobarbital, despite the fact that the drug is unavailable for sale to departments of corrections for use in executions. Plaintiff contends that while the FDOC's recent and current lethal injection procedures are not a meaningful improvement over the 2006 procedures, which the Governor's Commission on the Administration of Lethal Injection determined were "inadequate" and "insufficient" after the botched execution of Angel Diaz, the changes made to the lethal injection procedures in 2011 and 2012 have substantially altered the manner in which prisoners are executed in Florida, necessitating that the Court examine the constitutionality of the new procedures. The 2012 Protocol and the manner by which executions by lethal injections are currently performed create a substantial risk of serious harm, in violation of the Eighth Amendment.

23. The lethal injection procedures create a substantial risk that condemned inmates will experience severe pain and suffering during an executions. According to the 2012 Protocol, Plaintiff's execution by lethal injection will be accomplished by intravenous injection of a sequence of three chemicals: (i) 5 grams of pentobarbital, (ii) 100 milligrams of vecuronium bromide, and (iii) 240 milliequivalents of potassium chloride. Two of these substances, vecuronium bromide and potassium chloride, will cause excruciating pain and suffering if administered to a condemned inmate who is not sufficiently anesthetized.

24. The first chemical required by the 2012 Protocol is pentobarbital, a barbiturate. Defendants' replacement of sodium pentothal with pentobarbital in the protocol fails to take into consideration significant differences between the two drugs. The drugs are not interchangeable. Nonetheless, Defendants have not amended their protocol to take into account and plan for the differences between the drugs.

25. Unlike sodium pentothal, pentobarbital is not classified as an "ultra short-acting barbiturate." In a clinical context, pentobarbital is not FDA-approved for use as an anesthetic, and in clinical practice, it is not used to induce anesthesia. Pentobarbital is less lipid-soluble than sodium pentothal. Low lipid solubility increases the length of time it takes for a drug to take effect. A highly lipid soluble drug such as sodium pentothal quickly crosses the blood-brain barrier and causes the intended effect, i.e. the onset of anesthesia. Pentobarbital has an extended length of action due to its lower lipid solubility. In part because of its extended length of action, it is not used as an agent to induce anesthesia. Therefore, there is no standard clinical dose of pentobarbital to induce loss of consciousness or loss of sensation, making it much harder to determine how much

6

pentobarbital would constitute a sufficient overdose to induce anesthesia in the context of an execution.

26. Additionally, pentobarbital has to be stored at a very specific temperature and contains instructions to check for precipitation (the separation of solid parts from a solution) before use and a warning not to use if precipitation is present. The 2012 Protocol contains no warning or indication to check for precipitation nor does the 2012 Protocol specify the temperature at which the pentobarbital must be stored. Storing pentobarbital at a temperature cooler than recommended can slow down the time for the drug to take effect.

27. In the lethal injection process, pentobarbital is intended to anesthetize the condemned inmate, but if it is not successfully delivered into the condemned inmate's blood stream, the inmate may not be sufficiently anesthetized or may not remain anesthetized for the duration of the execution process. Under the 2012 Protocol, there is a substantial risk of an inadequate dose of pentobarbital being administered to the condemned inmate prior to the administration of the second and third drugs. Failure to successfully deliver a sufficient dose pentobarbital is foreseeable given that little is known about using the drug to induce anesthesia, and there is no standard clinical dose to induce surgical anesthesia. Use of this drug in this manner compounds the already existing risk of serious harm due to the inadequacy of the execution procedures and the inadequacy of the training and qualification of the personnel involved.

28. If pentobarbital is delivered to the Plaintiff in less than the intended dose (either because of misdelivery or failure to prepare the correct dose), the condemned inmate could remain conscious or regain consciousness (as occurred in the Angel Diaz execution), and

7

experience conscious paralysis and asphyxiation due to vecuronium bromide and the excruciating pain of the potassium chloride injection.

29. The proper preparation, dosage, and administration of the pentobarbital is therefore crucial to a humane and constitutional execution, because it is the only drug that prevents Plaintiff from experiencing the pain and suffering caused by the other two drugs. Defendants, however, have failed to adopt procedures and safeguards to protect against failed delivery of this drug.

30. Until December 2011, Lundbeck was the manufacturer and distributor of pentobarbital under the brand name Nembutal. Lundbeck's corporate statement regarding Nembutal explains that the use of pentobarbital in lethal injections is outside of the drug's approved uses, and that the manufacturer cannot ensure the drug's safety and efficacy for unapproved use.

31. In July of 2011, Lundbeck issued a press release detailing a change in their distribution of pentobarbital, specifically noting that it will deny distribution to prisons in the United States currently active in carrying out the death penalty by lethal injection. The new distribution plan also calls for the purchaser to sign a form stating that it will not redistribute any purchased product without written authorization from Lundbeck. Additionally, by signing the form, the purchaser agrees that the product will not be made available for use in capital punishment.

32. Moreover, Staffan Schuberg, the president of Lundbeck, sent two letters to Florida Governor Rick Scott prior to the September 28, 2011 execution of Manuel Valle expressing his opposition to what was Florida's first use of the drug as part of a lethal injection.

8

33. In December 2011, Lundbeck divested its interest in Nembutal and sold the product to Akorn Pharmaceuticals.  As part of that sale, Akorn agreed to maintain the restricted distribution program for Nembutal, so that the drug would not be available to departments of corrections to use in executions.

34. As part of its restricted distribution program, Akorn issues an Anti-Diversion Signature Sheet to all purchasers of Nembutal.  The signature sheet requires the purchaser to agree "that this product will not be made available for the purpose(s) of capital punishment, particularly since the effectiveness of such use has not been established for such purpose."  See Nembutal Anti-Diversion Signature Sheet attached as Exhibit B.

35. Upon information and belief, Plaintiff allege that, given the fact that Lunbeck restricted the distribution of Nembutal as of July 2011 such that departments of corrections could not obtain the drug for use in executions, and that pentobarbital has a limited shelf life, Defendants' current supply of pentobarbital is expired.

36. Alternatively, upon information and belief, Plaintiff alleges that Defendants do not have Nembutal and instead plan to use pentobarbital mixed by a compounding pharmacy.  Compounding pentobarbital for this use and in this manner is illegal.  The compounded drug would not carry FDA approval, and there would be no way to guarantee the purity and potency, and therefore the safety and effectiveness, of the drug.  Compounding pentobarbital for use in lethal injection executions leads to an unnecessary risk of pain and suffering, as it can cause serious reactions and infections.

37. The Florida Board of Pharmacy is the regulating body for all pharmacists in the State of Florida.  In November of 2012, the Florida Board of Pharmacy issued a survey to the 8,981 pharmacies that hold Florida permits (774 of the pharmacies are non-resident).

The survey asked the pharmacies to answer questions about their compounding activities and provide a copy of their last two inspection reports. A Report regarding the survey was published on January 23, 2013. See Florida Board of Pharmacy Compounding Survey Report attached as Exhibit C.

38. In deciding to conduct this survey, the Florida Board of Pharmacy recognized that there are risks associated with both sterile and nonsterile compounding. As Plaintiff is prepared to demonstrate more fully at an evidentiary hearing, such risks include the production of contaminated products or products that do not possess the strength, quality, and purity required to achieve the intended outcome.

39. Improperly compounded pentobarbital could be contaminated with various toxins. If the pentobarbital is contaminated, Plaintiff could experience pain and suffering upon injection.

40. If the compounded pentobarbital is not mixed in the correct amounts and the efficacy of the drug is compromised, the drug would not sufficiently anesthetize Plaintiff, thereby exposing him to pain and suffering upon the injection of the second and third drugs.

41. If the Florida Department of Corrections (FDOC) plans to use compounded pentobarbital, in executions, all of the risks described above would be present.

42. Alternatively, upon information and belief, Plaintiff alleges that Defendants' supply of pentobarbital has not been FDA-approved for use on humans and has been obtained through a veterinary source. Using pentobarbital from a veterinary source exposes Plaintiff to the risks described above.

43. Alternatively, upon information and belief, Plaintiff alleges that Defendants' supply of pentobarbital has been illegally imported. Using pentobarbital that has been illegally imported exposes Plaintiff to the risks described above.

44. Based on the allegations above, including the limited shelf life of pentobarbital and the fact that Defendants could not have legally purchased pentobarbital after July 1, 2011, Defendants supply of pentobarbital has to be one of the scenarios described above – the pentobarbital is either expired, illegally compounded, illegally obtained, or from a veterinary source. As such, Defendants do not have a safe, current, legal, or adequate supply.

45. Vecuronium bromide, the second drug Defendants intend to administer during the execution process, paralyzes all voluntary muscles, including the diaphragm, thereby stopping breathing by preventing air from being moved in and out of the lungs. Vecuronium bromide is not an anesthetic and does not affect consciousness or the perception of pain.

46. The use of vecuronium bromide substantially increases the risk that Plaintiff will be conscious during the injection of potassium chloride but unable to convey the torturous pain and suffering they are experiencing. The use of vecuronium bromide prevents the execution team from knowing whether a condemned inmate remains conscious or regains consciousness prior to the administration of the potassium chloride. If administered to a conscious person, vecuronium bromide would prevent respiration and cause the person to die slowly while remaining fully conscious and aware but unable to move or communicate.

47. Florida prohibits the use of any neuromuscular blocking agent "for any purpose" during the euthanasia of dogs and cats. Florida Statute 828.058(3). Neuromuscular paralyzing agents are prohibited because paralyzing animals in a way that potentially veils pain does not comport with professional ethical standards, including that of the American Veterinary Medical Association. (AVMA).

48. When vecuronium bromide is administered after an initial dose of pentobarbital, as required by the 2012 Protocol, it creates a substantial and unacceptable risk that a condemned inmate will be paralyzed but unable to indicate that he is consciously experiencing the agony of suffocation, the intense burning from potassium chloride, and the pain of cardiac arrest. Additionally, using pentobarbital that is compounded, expired, from a veterinary source, or otherwise improperly obtained increases the risk that the vecuronium will mask conscious paralysis and suffocation.

49. Vecuronium bromide serves no legitimate purpose in the execution procedure and serves only to mask any pain and suffering the inmate may experience. Use of the chemical in executions prevents the executioners and witnesses from knowing whether the condemned inmate is adequately anesthetized. In cases where pentobarbital is not successfully delivered and/or the condemned inmate is not adequately anesthetized, vecuronium bromide will create the appearance of a serene death while masking the fact that the condemned inmate is experiencing conscious paralysis, suffocation, and the excruciating pain caused by the injection or potassium chloride. Vecuronium bromide is unnecessary to bring about death and, absent the use of this chemical, a condemned inmate would be able to indicate that he was still conscious or had regained consciousness prior to the administration of potassium chloride.

50. The third and final drug Defendants intend to administer during the execution is potassium chloride, an extremely painful chemical that induces cardiac arrest by interfering with the heart's electrical activity. It is undisputed and indisputable that an inadequately anesthetized inmate injected with potassium chloride will experience torturous pain. As potassium chloride travels through the bloodstream from the injection site towards the heart, the chemical activates sensory nerve fibers inside the veins, causing a prolonged and intense burning sensation. In the foreseeable event that the condemned inmate is not adequately anesthetized during the execution procedure, the potassium chloride will cause the inmate torturous pain, but the inmate will be incapable of expressing his suffering due to the paralytic effect of the vecuronium bromide.

51. Death by potassium chloride poisoning is viewed as being so inhumane that the AVMA prohibits its use as the sole agent for animal euthanasia. If potassium chloride is to be used at all, the AVMA requires the practitioner administering the potassium chloride to have the proper training and knowledge to ensure that the euthanized animal has reached a surgical plane of anesthesia. The appropriate anesthetic depth for the use of a potassium chloride execution is "characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli." Conversely, the 2012 Protocol as written and applied lacks even the most basic protections or training regimen— safeguards that Florida requires for non-veterinary personnel who perform animal euthanasia. Accordingly, the lethal injection procedures that will be used on Plaintiff would be illegal if performed on household pets.

52. Specifically, the 2012 Protocol does not require an appropriate level of expertise or proficiency required for the personnel who perform the tasks involved in the lethal

13

injection process.  While the it does set forth some minimum qualification requirements for the medical personnel, the 2012 Protocol does not establish any minimum experience requirement, nor that the personnel performs their tasks as part of their regular employment.

53. The written protocol allows for central venous line placement, with or without a venous cut-down (wherein a vein is exposed surgically and a cannula is inserted), if peripheral venous access is not possible.  Because central line placement is an invasive procedure that carries risks of immediate life-threatening painful complications, only a qualified and experienced medical professional, i.e. a physician with specialized training, can place a central line.  The 2012 Protocol lists the "classes of trained professionals" that will perform such a procedure if necessary.  However, the list includes "an advanced registered nurse practitioner" and a "physician's assistant," both of whom are not qualified to place central lines.  Allowing someone without proper training to place a central line would unreasonably cause unnecessary pain and suffering and creates a substantial risk of serious harm.

54. There are no guidelines upon which the members of the execution team can rely if they are required to exercise their discretion during the process.  The 2012 Protocol has no plan in place if foreseeable problems arise during Plaintiff execution.  Because the execution personnel are not adequately trained, they will be incapable of reacting effectively and quickly to foreseeable contingencies, thus increasing the danger that Plaintiff will suffer needless pain.

55. The absence of standardized procedures regarding purchase and administration of the execution drugs, the lack of adequate medical qualifications for the personnel involved in

the process, and the reliance on the three particular chemicals used in Florida create a grave and substantial risk that the Plaintiff will be conscious throughout the execution process, and, as a result, will experience an excruciatingly painful and protracted death.

56. On December 13, 2006, it took 34 minutes for the execution team to kill Angel Diaz at Florida State Prison. Eyewitnesses reported Mr. Diaz spoke, gasped for air, and grimaced in pain during his execution. They observed his face contort, his jaw clench, and his head roll throughout the botched execution.

57. On December 15, 2006, Governor Jeb Bush effectively stayed all executions and immediately issued an Executive Order establishing a Governor's Commission on the Administration of Lethal Injection.

58. The Governor's Commission on the Administration of Lethal Injection's Final Report made 37 recommendations to the Department of Corrections in order to address the procedural inadequacies and administrative failures leading to Mr. Diaz' gruesome execution.

59. The Commission found that the IVs placed in Mr. Diaz's arms were improperly placed such that the execution drugs were administered into his flesh, rather than into his veins. The Commission also determined that the execution team was not adequately trained to perform their tasks properly. The evidence produced from Mr. Diaz's execution showed that: both the principal and back-up intravenous catheters were improperly placed; sodium pentothal was injected subcutaneously, rather than into the venous system as intended; the first drug to unequivocally enter Mr. Diaz's circulation system was pancuronium bromide; and Mr. Diaz's death was likely due to asphyxiation while

conscious or partly conscious, rather than after he was adequately anesthetized and unable to feel pain or suffering.

60. Defendants have not specified whether the executioners who made the grievous errors and flawed decisions during Mr. Diaz's execution will still participate in future Florida executions. Further, despite revisions made to the execution procedures based on the Commission's recommendations, the 2012 Protocol still fails to offer a clear and express definition of "medically qualified" as pertaining to the two assigned executioners.

61. Defendants' 2012 Protocol does not require a specific amount of time to elapse between the administration of pentobarbital and the next two drugs. It is imperative that the first drug has time to take effect to ensure Plaintiff is sufficiently anesthetized and no substantial risk of pain exists.

62. Defendants' 2012 Protocol does not address the problems and the potential complications exemplified by the Diaz execution. While the 2012 Protocol allows for a determination of consciousness by the warden after the administration of the pentobarbital, the warden has no medical training, thereby increasing the risk that Plaintiff's state of consciousness will not be properly discerned.

63. Defendants' 2012 Protocol states that a member of the execution team will assess, and the team warden ultimately will determine, whether Plaintiff are unconscious, but the protocol does not require that either person be medically-qualified to evaluate whether a person is adequately anesthetized. Moreover, the consciousness assessment is performed immediately following the administration of the pentobarbital. This manner of assessing consciousness is completely ineffective and meaningless within the execution process. For a lethal injection execution to comport with the Eighth Amendment, the inmate must

be in a surgical plane of anesthesia before the vecuronium bromide and potassium chloride are administered, and the inmate must remain deeply anesthetized until he is dead. For this reason, any assessment of anesthetic depth must be performed by a qualified and competent medical professional who is able to monitor anesthetic depth in paralyzed patients.

64. The Defendants' method of remote drug administration though several feet of IV tubing, from a different room, increases the risk of harm to the Plaintiff.

65. Unlike in the Diaz execution, where the curtains remained open, Defendants' 2012 Protocol dictates that the curtains between the witness room and execution chamber be closed if something goes wrong during the execution, thus impeding transparency and accountability in case the same mistakes or problems occur.

## COUNT I

## VIOLATION OF RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENTS PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

66. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 65.

67. Defendants are acting under color of Florida law in administering to Plaintiff chemicals that will cause unnecessary pain in the execution of a sentence of death, thereby depriving Plaintiff of his rights under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment, in violation of 42 U.S.C. § 1983.

68. Feasible, readily implemented alternative procedures exist that would significantly reduce the substantial risk of excruciating pain created by Florida's deficient protocol. These

alternative procedures include, but are not limited to, a protocol that remedies the deficiencies set forth in paragraphs 1-65 of this complaint.

69. Defendants' 2012 Protocol and the procedures by which the 2012 Protocol is carried out violate Plaintiff's rights under the cruel and unusual punishment clause of the Eighth Amendment because (a) the protocol creates the substantial risk of serious harm; (b) the protocol does not comport with contemporary norms and standards of society; and (c) the protocol offends the dignity of the person and society.

70. The failure of Defendants to take sufficient measures to minimize the risk of substantial, extreme and excruciating pain and mutilation, when such risk could readily be prevented by adopting an alternative procedure to remove the risks in the 2012 Protocol, violates the Eighth and Fourteenth Amendments to the United States Constitution.

71. Defendants have consistently failed to employ personnel who are sufficiently competent, trained and qualified to properly perform executions or to effectively react to foreseeable contingencies, such as what happened in the Diaz execution. Even if the 2012 Protocol specified that executions had to be performed by an anesthesiologist, it would be incumbent upon the Defendants to ensure that the anesthesiologist hired was competent and fit to perform executions, as well as adequately trained and integrated into the execution process. Defendants have consistently failed to ensure that its personnel are adequately trained in the execution process. Defendants do not understand the procedure and its dangers, as evidenced by the cavalier comments made by representatives of the Department of Corrections after the botched Diaz execution. Based on the foregoing, Plaintiff believes that Defendants will continue to employ untrained, incompetent, or unfit execution personnel.

72. Because of the way the 2012 Protocol is written, the executioners are the ones who will have to make on the spot decisions affecting whether the execution is humane. Therefore, it is crucial that Defendants employ qualified, competent personnel who are trained in the execution procedure. Because Defendants have not done so, they have not reasonably ensured that the 2012 Protocol will be performed as written.

73. The 2012 Protocol does not allow for an adequate individualized assessment of Plaintiff's specific medical conditions. The dosage of the drugs remains the same regardless of the height and weight of the inmate. While a medical examination is contemplated a week prior to the execution, there is no indication that Plaintiff has a right to have their attorney present or to have an independent examination conducted by a physician of his choosing. The 2012 Protocol fails to adequately explain how any issues relating to venous access will be resolved.

74. Defendants' 2012 Protocol fails to address the appropriate medical response to reasonably foreseeable complications. Specifically, the 2012 Protocol includes no safeguards that would protect the Plaintiff in the event a stay of execution is entered after the lethal injection process has begun. Thus, the 2012 Protocol fails to provide any protections to prevent the Plaintiff from being wrongfully executed should a reprieve be granted after the process has begun but before death has occurred.

75. At any time before the potassium chloride is administered, the Plaintiff could be readily resuscitated if trained personnel and routine resuscitation medication and equipment were present at the execution site. Even after the potassium chloride is administered, resuscitation would still be possible, albeit more challenging. Any resuscitation, however, would require the close proximity of the necessary equipment, medication, and

properly trained personnel.  The omission of such personnel and equipment under the protocol further undermines the constitutionality of the procedure.

76. Defendants' unwillingness (1) to adopt adequate and effective procedures that ensure the proper administration of the least painful combination of chemicals, (2) to set forth clear and transparent qualifications for the personnel directly involved with lethal injection executions, and (3) to lay out guidelines and offer strict training to ensure a successful and efficient execution process and the proper handling of a medical emergency, demonstrates Defendants disregard for Plaintiff's constitutional right to be free from cruel and unusual punishment.

## COUNT II

**VIOLATION OF RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENTS PURSUANT TO ARTICLE I, §9 AND §17 OF THE FLORIDA CONSTITUTION.**

77. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 65.

78. The Florida Constitution also provides Plaintiff with the right to be free from cruel and unusual punishments.   The Florida Constitution specifically provides that "[t]he prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution." Article I, §17.

79. This section inherently means that all executions shall be carried out humanely.

80. As alleged above, Plaintiff contends that Defendants, as a result of their failures to implement sound alternative procedures, carry out their written protocol in a safe and

effective manner, and guarantee the use of properly-trained personnel, have inflicted pain

and torture on executed prisoners in the past, thereby unnecessarily exposing Plaintiff to

the risk of suffering the same fate unless Defendants adopt a humane and safe execution

protocol.

81. Plaintiff contends that Defendants' continued use of a three-drug protocol (that includes

vecuronium bromide and potassium chloride), when readily-available, safer alternatives

with proven track records exist, establishes that the demonstrated risk of severe pain by

Defendants' process is substantial when compared to the known and available

alternatives.  Defendants have refused to adopt such alternatives in the face of these

documented advantages, without any legitimate penological justification for their

continued retention of the three-drug protocol.

## COUNT III

**VIOLATION OF RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENTS PURSUANT TO FL. STAT. 922.105.**

82. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 65.

83. Fl. Stat. 922.105(3) provides in part that "all persons sentences to death for a capital

crime shall be executed by any *constitutional* method of execution." (emphasis added).

84. This subsection inherently means that all executions shall be carried out humanely.

85. As alleged above, Plaintiff contends that Defendants, as a result of their failures to

implement sound alternative procedures, carry out their written protocol in a safe and

effective manner, and guarantee the use of properly-trained personnel, have inflicted pain

and torture on executed prisoners in the past, thereby unnecessarily exposing Plaintiff to

the risk of suffering the same fate unless Defendants adopt a humane and safe execution protocol.

86. Plaintiff contends that Defendants' continued use of a three-drug protocol (that includes vecuronium bromide and potassium chloride), when readily-available, safer alternatives with proven track records exist, establishes that the demonstrated risk of severe pain by Defendants' process is substantial when compared to the known and available alternatives. Defendants have refused to adopt such alternatives in the face of these documented advantages, without any legitimate penological justification for their continued retention of the three-drug protocol.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

    (a) Temporary, preliminary, and permanent injunctive relief by enjoining the Defendants from executing Plaintiff by means of lethal injection in accordance with the existing procedures and protocols;

    (b) Issue an Order declaring unconstitutional the Defendants' lethal injection protocols and procedures, as a violation of the Eighth and Fourteenth Amendments to the United States Constitution and/or Article I, Secs. 9 and 17 of the Florida Constitution and/or Fl. Stat. 922.105;

    (c) Such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

**s/Maria E. DeLiberato**
Maria E. DeLiberato
Florida Bar No. 664251
Assistant CCRC
Email: deliberato@ccmr.state.fl.us

**s/Marie-Louise Samuels Parmer**
Florida Bar No. 0005584
Assistant CCRC
Capital Collateral Regional Counsel-
Middle Region
3801 Corporex Park Drive, Suite 210
Tampa, FL 33619
Office 813 740 3544
Fax 813 740 3554
Email: parmer@ccmr.state.fl.us

*Attorneys for Plaintiff*