IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ETHERIA V. JACKSON,
Plaintiff,

vs.

Case No. 3:10-cv-1130-J-32MCR

JOHN PALMER, etc.; et al.,
Defendants.

---

CHARLES G. BRANT,
Plaintiff,

vs. Case No. 3:13-cv-412-J-32MCR

JOHN PALMER, etc.; et al.,
Defendants.

---

DANE P. ABDOOL,
Plaintiff,

vs. Case No. 3:13-cv-413-J-34JBT

JOHN PALMER, etc.; et al.,
Defendants.

---

JOE ELTON NIXON,
Plaintiff,

vs. Case No. 3:13-cv-433-J-99MMH-MCR

JOHN PALMER, etc.; et al.,
Defendants.

---

MOTION HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN AND
THE HONORABLE MARCIA MORALES HOWARD
UNITED STATES DISTRICT JUDGES
Jacksonville, Florida
November 6, 2013
10:09 a.m.
Courtroom No. 10D

(Proceedings reported by microprocessor stenography; transcript produced by computer.)

A P P E A R A N C E S

PLAINTIFFS' COUNSEL:

**ERIC M. FREEDMAN, ESQ.**
Law Office of Eric M. Freedman
250 West 94th Street
New York, New York 10025

**MARIA E. DELIBERATO, ESQ.**
**MARIE-LOUISE SAMUELS PARMER, ESQ.**
Capital Collateral Regional Counsel
3801 Corporex Park Drive, Suite 210
Tampa, Florida 33619-1136

DEFENSE COUNSEL:

**SCOTT A. BROWNE, ESQ.**
Office of the Attorney General
3507 East Frontage Road, Suite 200
Tampa, Florida 33607-7013

**SUSAN A. MAHER, ESQ.**
Office of the Attorney General
PL-01 - The Capitol
400 South Monroe Street
Tallahassee, Florida 32399-1050

P R O C E E D I N G S

November 6, 2013 10:09 a.m.

- - -

COURT SECURITY OFFICER: All rise. The United States District Court in and for the Middle District of Florida is now in session. The Honorable Timothy J. Corrigan presiding. The Honorable Marcia Morales Howard presiding.

Please be seated.

JUDGE HOWARD: My name gets them every time.

All right. We are here on four cases: 3:10-cv-1130-J-34MCR, *Etheria Jackson versus Steven Singer* -- well, no, it's, I guess, the current secretary now, right?

MS. DELIBERATO: Yes, Your Honor. It's Crews.

JUDGE HOWARD: Crews. That's what I thought.

Okay. That docket hasn't been updated.

All right. 3:13-412-J-32MCR, which is *Charles G. Brant versus Defendant Crews and Palmer*. And we have 3:13-cv-413-J-34JBT, *Dane P. Abdool versus Palmer and Crews*. And *Joe* -- and, I'm sorry, 3:13-cv-433-J-99MMH-MCR, which is *Joe Elton Nixon versus Defendant Crews*.

Counsel, if you could make your appearances for the record, please, beginning with the plaintiff.

MS. DELIBERATO: Good morning, Your Honor. It's Maria DeLiberato from CCRC in Tampa, on behalf of plaintiffs Jackson, Brant, and Abdool, and local counsel for plaintiff

Nixon.

MS. PARMER: Good morning, Your Honor. It's Marie-Louise Samuels Parmer, CCRC in Tampa, also on behalf of plaintiffs Jackson, Brant, and Abdool.

MR. FREEDMAN: Good morning, Your Honor. Eric M. Freedman of the New York Bar, admitted pro hac here for Joe Elton Nixon.

MR. BROWNE: Good morning, Your Honors. Scott Browne with the Attorney General's Office on behalf of all of the defendants.

MS. MAHER: Good morning, Your Honors. Susan Maher on behalf of all of the defendants.

JUDGE HOWARD: All right. Ordinarily we go through the motions that we're addressing at this case -- at this hearing, but I think it would only be fair to say there are a slew of motions in these four cases. A lot of them, though, are interrelated.

And probably what makes the most sense to us is to take up the motions to amend the complaint -- or to file amended complaints, because those resolve a lot of -- a lot of the current motions.

And there -- while there are some other issues raised, the two main arguments dealing with the amended -- or the request to amend the complaints appear to be futility based on failure to exhaust and futility based upon the idea

that these claims have already been resolved by the binding precedent in *Valle* and *DeYoung* and *Powell* and *Ferguson*, and all the cases that you-all know.

I guess in -- in my three cases -- and I think -- I haven't read his.

In my three, I think the argument was if we haven't exhausted we're in the process of exhausting.

Is that -- I know that was true for Mr. Abdool. I know it was true for Mr. Nixon. Is that also true for Mr. Jackson?

MS. DELIBERATO: Yes, Your Honor. It's true for all three. We actually were at the prison yesterday and were able to communicate with our clients.

They are all -- have all filed grievances. And they're at the final stage in Tallahassee, which is the last stage of exhaustion.

The only plaintiff which I understand is not Your Honor's case is Plaintiff Brant. He's being held at the Hillsborough County Jail currently pending his state post-conviction evidentiary hearing. So he will not be returned until sometime after November 8th.

His hearing concludes this Friday. So he has not yet been able to exhaust, because he is not in the custody of the Department of Corrections.

JUDGE CORRIGAN: Is that the issue? Because I -- I

wanted to make sure I understood. Is he unable to file a grievance? Is that what they do, is file a grievance?

MS. DELIBERATO: That's what they do. And the forms --

JUDGE CORRIGAN: Is he unable to file a grievance if he's in somebody else's custody?

MS. DELIBERATO: Yes, Your Honor, because he doesn't have access to the forms necessary. It has to go through the -- informal with the captain and then the warden through the institution up to Tallahassee. And he's being held in the Hillsborough County Jail in Tampa.

JUDGE CORRIGAN: And can you do it for him, or not?

MS. DELIBERATO: No.

JUDGE CORRIGAN: I mean, that's a rule?

MS. DELIBERATO: Yes. That's my understanding. We've never been able to -- to file exhaustion on behalf of -- and certainly if I'm able to, we can do that. He should be back into the custody of the Department of Corrections by --

JUDGE CORRIGAN: How many times has lethal injection protocol been administratively grieved, to your knowledge?

MS. DELIBERATO: Well, we have seven cases pending throughout the Middle District. And all of our clients have administratively grieved at numerous times, because it's been changed so many times. And, also, I know many of the cases under warrant -- I'm going to guess 10 to 20. But it may be

more than that.

JUDGE CORRIGAN: And what's been the response to the grievance in all those cases?

MS. DELIBERATO: That there is no available remedy at the prison, it has to be resolved -- the constitutionality has to be resolved in the courts.

JUDGE CORRIGAN: Thank you.

JUDGE HOWARD: All right. I guess -- I don't know -- Ms. Maher or Mr. Browne, what is the point of -- is the point here just delay it so they file an amended complaint, but by then their claim is time-barred? I mean, if -- if they're currently exhausting, why not just allow the amended complaint?

MS. MAHER: Because of *Smith versus Terry* and the fact that the exhaustion requirement is mandatory. It doesn't matter that others have grieved the same issues. The plaintiff in the case must exhaust.

JUDGE HOWARD: Well, *Smith versus Terry* is not -- it's not a published decision. It's just a -- it's just a panel of the circuit. It's not binding precedent.

MS. MAHER: I understand, Your Honor, but it is the latest thing that is out there. And I believe that that is exactly what is required under the law. It is a United States Supreme Court case that says that it is a mandatory requirement and it can't be waived.

JUDGE HOWARD: But what -- what is the point of them pursuing -- your responses to them say there's no available remedy, it has to be resolved by the courts.

So what is the point of them grieving through the prison system that has absolutely no authority whatsoever to give them any relief at all; not just the relief they seek, but can't give them any relief at all?

MS. MAHER: It doesn't matter that they can't give the relief. The law is the law. And the United States Supreme Court has said even if there is not a remedy available at the prison, they must exhaust.

JUDGE CORRIGAN: So let's be clear, there is not any chance whatsoever ab initio that any of these grievances are going to result in anything other than the exact same statement that they always get, which is that there's no remedy and you've got to go to court, right?

There's no -- the State of Florida, the Attorney General, Department of Corrections, there is absolutely zero chance that any of these grievances are going to be successful in any manner whatsoever; is that correct?

MS. MAHER: I don't believe that that -- I can say that.

JUDGE CORRIGAN: How can you not say it?

MS. MAHER: I think that there may be grievances that present factual issues or claims that could be addressed

by them with regard to the substitution of the drugs.

If the question is, though, is it constitutional, then I think, of course, it has to be resolved by the courts.

JUDGE CORRIGAN: Which is what you always tell them, right?

MS. MAHER: It has been to date, I believe, yes.

JUDGE CORRIGAN: Sure. And that's what you're going to keep telling them, right?

MS. MAHER: If the question is of constitutionality, yes.

JUDGE CORRIGAN: What would be the other question that you could ask that the State might give a different answer to?

MS. MAHER: I think the various challenges to the drugs, if there were a valid factual basis given to the Department to consider why a particular drug should not be used in the protocol, I think that is different.

JUDGE CORRIGAN: So you're saying --

MS. MAHER: We would consider that.

JUDGE CORRIGAN: So you're saying that if they -- if they were to say to you in a grievance, We don't think this drug is appropriate for use medically, or, We think there is a state statute that prohibits it, or, We think that -- some other non-constitutional reason for not using this drug, then you're saying the State would consider that?

MS. MAHER: Absolutely.

JUDGE CORRIGAN: And what do you think the answer is going to be?

MS. MAHER: I don't know. I can't imagine what it would be.

JUDGE CORRIGAN: Well, hasn't the State already written in the September 9th, 2013, letter that this is a perfectly appropriate procedure and it meets medical standards and that we have investigated it thoroughly and so forth?

Isn't that what they've already said?

MS. MAHER: Maybe as to this particular drug, yes.

JUDGE CORRIGAN: Right. And so I guess I'm asking you -- you're saying that -- you're telling us that exhaustion in this scenario, even though it's futile -- and it's kind of ironic, I guess, because you're saying that their motion for leave to amend is futile because they haven't -- because they don't have a chance.

You're telling me that even though ab initio we know this is a futile act and we know that -- what the answer is going to be, that they've got to do it anyway?

MS. MAHER: I am saying that. I'm saying that is what the PLRA requires.

JUDGE CORRIGAN: And the State of Florida is happy with that? I mean, they -- they think that this is the way it ought to be?

MS. MAHER: I do think it is the way it should be.

JUDGE CORRIGAN: Okay.

MS. MAHER: And, I mean, there are many claims besides these of lethal injection where inmates are raising constitutional questions that cannot be answered by the Department of Corrections. And they still must exhaust.

JUDGE CORRIGAN: All right. I'll ask you one more question and then I'll stop for a minute. My -- my petitioner, Mr. Brant, I'm told -- now, I don't know this.

But my petitioner, Mr. Brant, has been deemed by the State to be timely in his filing in this court, unlike many of the other previous petitioners, because he actually filed it within four years of the date set by the Eleventh Circuit under the precedent.

Now, I'm told -- and I don't know this. I'm told he's coming on those four years. So if I dismiss his complaint, tell him to go exhaust, and he can't get that done by that date and then he files a complaint, what's the State going to do?

MS. MAHER: Well, there is case law that says it is tolled during the grievance process as long as he starts the grievance process during the four-year statute of limitation.

JUDGE CORRIGAN: That's the law?

MS. MAHER: There is case law, yes.

JUDGE CORRIGAN: Is that going to be the State's

position?

MS. MAHER: I would think it would be, because it's the law.

JUDGE HOWARD: Let me ask you about the futility argument that you're raising, because the -- the other futility argument that you're raising, which is -- and I guess on two of my folks there's a statute of limitations argument, but there isn't as to Mr. Abdool. I think it's Mr. Abdool who appears to be timely.

MS. MAHER: That's correct, Your Honor.

JUDGE HOWARD: Okay. The argument -- there are really two arguments raised, then, by you in the motion -- or in response to the motion to amend.

And one is the exhaustion argument. And the other is the futility argument because he fails to state a claim. But that's based on the old protocol, right?

MS. MAHER: The failure to state a claim is based on all of the protocols. I mean, the substitution of a drug in and of itself is not -- doesn't state a claim. It doesn't -- it doesn't present --

JUDGE HOWARD: Gosh, where has that been decided, that the substitution of a drug doesn't state a claim?

MR. BROWNE: Yes, Your Honor.

JUDGE HOWARD: A particular -- the courts have found that particular substitutions failed to state a claim after

fully evaluating those substitutions.

But I don't -- I don't think I've seen any authority that says that just the substitution of a drug in any circumstance wouldn't state a claim.

Is that what you're saying?

MR. BROWNE: Well, Your Honor, I think you're -- you're partially correct. Substitution -- the Eleventh Circuit has held in a number of cases that merely substituting one anesthetic, pentobarbital, for sodium pentothal was not a substantial change that would renew the statute of limitations period.

So I think it, in fact, was a recognition by the court in a number of cases, *DeYoung*, *Valle*, *Thomas*, that simply substituting a drug is not sufficient to state a claim. So I think that is accurate.

But I don't think you can say that the State or the defendant can substitute any drug and not at least examine what the allegations would be.

And now we're at that stage. We can examine -- now, the futility argument is, We have substituted one anesthetic for another.

Their attempt to raise this claim does not question -- call into serious question under the Eighth Amendment whether or not his execution, or any of the plaintiffs' executions, will violate the Eighth Amendment.

And, therefore, we think that the -- it would not cure the complaint that should be dismissed on a 12(b)(6) motion.

JUDGE HOWARD: In the *Mann* -- why don't just one of you stand at a time, please.

In *Arthur*, the Eleventh Circuit reversed the district court for dismissing the claims because the -- the Eleventh Circuit considered the allegations to be different than those that had been decided previously in *Valle* and in *DeYoung* and *Powell*. And that was in a -- a published Eleventh Circuit decision.

And then the Eleventh Circuit came back to that more recently in *Mann* and explained the meaning of the *Arthur* decision.

And what it said was that the district court is required to determine whether the facts in the new complaint are materially different from the allegations that had previously been found to be an insufficient change.

And, basically, if they are not materially different, then the district court should dismiss. If they are materially different, the district court should allow the claim to go forward. Right?

MR. BROWNE: I agree with most of what you said, Your Honor. Exactly. That's what *Arthur* indicates. They say at least the court, on a motion to dismiss -- or should examine what the specific factual allegations were.

Now, the district court in Alabama said, I don't really care; this has been foreclosed by Eleventh Circuit precedent.

We're at a stage now, though -- but they did not say that you have to accept each allegation as true to the extent they are rebutted by either facts in prior cases or binding case law.

So in this case we're asking this court to look at the allegations as pled, and as pled in the amended complaint -- or their attempt to plead an amended complaint, and find those claims legally insufficient as a matter of established law.

There is a long line of cases on lethal injection, from *Baze*, *Valle*, most recently *Mann*, that resolve virtually -- I would say every claim that the plaintiffs have made in this case.

JUDGE HOWARD: But in the past, when there's been a change to the protocol, there has been an examination of the drug -- there's been some vetting of the drug through the experts before the determination is made that it is not a substantial change in the protocol.

It happened in *Valle* -- well, I guess in -- with the first change, it started up in, I guess -- I can't remember if *Powell* was first or if *DeYoung* was first. I think *Powell* was first.

And then in *Ferguson*, when there was the second change, there was the same sort of evaluation of the -- of the evidence. Yes, there was, because I did it.

MR. BROWNE: That's not true. The first two was my case. The change in *Ferguson* was vecuronium bromide, which is the neuromuscular.

So the Eleventh Circuit affirmed. And there has been no evidentiary hearing in either state or federal court based on that.

JUDGE HOWARD: I didn't say there was an evidentiary hearing. There was a vetting through -- there was an analysis of the allegations that were made and whether or not -- and there was a -- the very significant difference there was it was a change not in the first drug, but in the second drug.

MR. BROWNE: Well, that is clearly a difference, Your Honor.

JUDGE HOWARD: Well, it was a significant difference, because the -- most of the allegations dealt with the question of whether or not you could effectuate consciousness -- or lack of consciousness, excuse me.

And there weren't any new allegations on that issue, right?

MR. BROWNE: No. Variations of previously rejected, Your Honor. But I think it's wrong to conclude that you -- you go to the evidentiary hearing stage based on the change in

the anesthetic drug.

JUDGE CORRIGAN: I don't know. I did -- I had the *Pardo* case. And -- and I think -- and I'd have to go back and look, but I think you-all had just changed the first drug. And I had an evidentiary hearing, a limited one, because it was right on a stay issue.

And the Eleventh Circuit -- I don't want to say congratulated me, but they took note of the fact that I'd had an evidentiary hearing and that I had gotten the State to come in and explain themselves and so forth. And they didn't tell me, Gosh, you shouldn't have been doing that or anything like that.

And so, you know, I guess what I'm having a hard time understanding -- I can understand that you need a good complaint to test. And I think we probably need to talk to your opponents about that.

But surely the State of Florida couldn't have thought that when it changed the first -- after having litigated this issue and finally gotten to a place where the protocol had been upheld by the courts enough that prisoners -- petitioners weren't even challenging the protocol anymore, and the courts were more summarily dealing with the issue, surely the State of Florida, when it issued this letter on September 9th, 2013, knew that they were going to be called to account for this new protocol and whether it meets

constitutional standards. Surely. Right?

MR. BROWNE: Well, certainly, Your Honor. And I -- you know, in all candor, certainly we anticipate these challenges. No doubt.

Every time -- we could change anything in a protocol and we know that there are defense attorneys whose goal is ultimately to prevent their execution.

So, you know, whether the change is minor or not, it will be challenged. So we certainly anticipate that. But I think it's bad precedent in this case.

We have an anesthetic drug. We have substituted one lethal dose of an anesthetic for another, Midazolam.

And their complaint does not allege any particular properties of this drug that would render it -- if administered properly, would not render the inmate unconscious.

You don't have any supporting affidavits. You have not even -- the only expert they cite is a law professor from Fordham and an anti-capital punishment crusader. She has -- she is not a qualified expert.

Their argument is essentially what has been rejected every single time, that there is a better -- marginally better, safer alternative; therefore, his execution -- or the plaintiff's execution would be unconstitutional under the Eighth Amendment.

JUDGE CORRIGAN: Why did the State change the protocol? I mean, after having litigated it and litigated it -- and then I think the protocol I dealt with was the -- the first drug was changed in 2007.

And I think Mr. Pardo -- because, I believe, *Ferguson* got stayed, Mr. Pardo ended up being the first petitioner who was actually going to be executed under that protocol change. And so that's why I felt like I should make some evidentiary determination.

And -- but you've got *Valle.* You've got *Ferguson*. You've got *Pardo*. You've got all these cases where these issues were vetted out.

And the law, as best it can in death penalty cases, had become settled on this point. And then the State of Florida, on September the 9th, says, Never mind, we're going to start all over again.

And, I mean, I have -- I have anecdotal reasons why, but I don't know -- why did the State change the protocol?

MR. BROWNE: Your Honor, I am not privy to those -- those discussions are above my pay grade. I -- I believe it was due to availability. I could be wrong.

JUDGE CORRIGAN: Well, I mean, that's the anecdotal -- the anecdotal thing that you hear is that they couldn't get it anymore because the manufacturer didn't want it to be used for death penalty work. And I didn't know if

the State of Florida had an official position on that.

So your official position is you don't know why they did it, but they did it, and it doesn't really matter why they did it, it matters whether it's constitutional or not?

MR. BROWNE: Exactly, Your Honor. And the law is clear, because *Baze* created a safe harbor, an anesthetic three-drug protocol, including an anesthetic -- and you don't look at a parade of horribles if -- or whenever. Human error is a possibility.

But in this case they've not alleged any facts peculiar to Midazolam that would not render an inmate unconscious. And, you know, five grams is what you would get on an anesthetic dose.

The State of Florida is administering 250 milligrams of that drug twice. That is sufficient to render an inmate completely unconscious.

Now, the allegations about movement, Your Honor -- if you would like me to address some of these other allegations?

JUDGE HOWARD: The allegations regarding Mr. Happ?

MR. BROWNE: Correct, Your Honor. I will do so.

JUDGE HOWARD: Go ahead.

MR. BROWNE: The allegation is that Mr. Happ -- and these are only from newspaper articles. They have not submitted any affidavits of any eyewitnesses -- was that

Mr. Happ moved after the consciousness check. There was slight movement in -- from his head. That's from an AP report.

Now, some of the headlines embellished quite a bit, like writhing in pain. No one has reported that. But what *Baze* indicates is that movement is quite possible even when you -- and expected when you're unconscious. That's why we administer a neuromuscular blocking agent in this case, vecuronium bromide.

So *Baze* essentially resolves that question. There's no evidence presented by the plaintiffs that Mr. Happ suffered any pain in his execution, much less attempt to meet their burden, which is that the State's protocol will, or is very likely to, cause serious illness and needless suffering.

And, again, that's the first step. Do their allegations meet that high bar? They simply do not in this case. And, therefore, we think that the complaint --

JUDGE CORRIGAN: Why doesn't the State of Florida -- why wasn't there a scientific medical report attached to the September 9th letter which -- which says -- because a lot of states have these actual justifications in their -- in their -- why doesn't the State of Florida justify it so it's not a question, so it's not an issue, and, you know, why -- I mean, why does it have to be -- why is it such a big secret how it's done or why it's done?

I just -- I don't really understand what the -- what the -- I mean, we had -- in my *Pardo* hearing, you know, they didn't really want to say where they were getting it from or any -- I just don't understand what the -- what the problem is.

If it's -- I mean, obviously, it's a -- you know, there's some controversy about it. And it's -- and it's a public decision by the State of Florida to take a life.

And I just don't understand exactly why every step of that and every consideration of that isn't publicly available and easily available, rather than doing this by lawsuits where -- where you have to -- you have to -- every time y'all change the protocol, we end up starting all over again.

And I just don't -- I don't really understand exactly why it's done the way it's done. It seems like it's inviting challenges, as opposed to ameliorating the possibility of them.

MR. BROWNE: Your Honor, first of all, Florida is, I think, fairly transparent, because we publish our protocol. The defendants get it. When we change it, we let everyone know. There's a submission.

Louisiana doesn't even have a written protocol that they're required to provide to the defendants. I believe Alabama has much more secrecy regarding their protocol and

their procedures than the State of Florida.

JUDGE HOWARD: That argument doesn't usually work for my children when they say that the other kid in their class does it worse.

MR. BROWNE: It doesn't work for mine either, Your Honor.

But I think the question is: Why aren't we more transparent? We substituted one anesthetic drug for another. Midazolam has a history -- it is used as an anesthetic.

I don't think anyone who -- you know, we do know that it will be challenged -- thought that there could be a serious challenge to that drug.

Because one of the challenges to pentobarbital is it's an off-label use; it's not used for anesthesiology and to render someone unconscious.

Midazolam -- that's one of its purposes in this case. In much smaller doses, it will render you unconscious. If you went for a root canal, your dentist may administer --

JUDGE CORRIGAN: Why weren't you using it -- if it's so great, why weren't they using it before? Why do we go through the -- from 2007 to 2013, why weren't they using it -- if it's the be-all and end-all, why isn't it that then what they've been using all along?

MR. BROWNE: Your Honor, I --

JUDGE CORRIGAN: Because what it -- you know, it

makes you think that they couldn't use the one they really wanted to use, so now they're having to use something different.

And so why is that the wrong way to think about it?

MR. BROWNE: Well, I think -- because, you know -- it sounds like -- and I understand, Your Honor, you're confronted with these claims no matter what.

So the notion that pentobarbital -- we had -- we had it settled, it was settled law, it's not true. Mr. Abdool and these plaintiffs filed their challenges.

When we had pentobarbital, it was resolved by certain precedence, so -- but, you know, first of all, we're going to get these lawsuits. I think they're bordering on frivolous now.

But, nonetheless, Your Honor, you can always find an alternative drug, an anesthetic. We had problems with availability, I believe, as an officer of this court. We switched to a well-known anesthetic drug that we believe is available that will do the job and then some.

So I think --

JUDGE CORRIGAN: And are there actual -- I understand that they're going to have to prove their case, if they have a case.

But are there actual medical doctors employed by the State of Florida or -- or employed by them as experts who

will -- who have already said to the State, This is a safe way to do this and it's going to achieve unconsciousness and, you know, this is -- this is a medically acceptable way to do this?

Is there -- is there -- you say they only have a law professor. And I hear you. Who do you have? Who does the State of Florida have that is a doctor or a medically trained person that says this is bad -- I mean, This is fine to do this, or, This is acceptable, or, This is -- you will achieve unconscious for sure when you do this? Who does the State have?

MR. BROWNE: Well, I think that's kind of turning it -- standing it on its head. We -- you know, I don't want to mention -- Mr. Crews investigated it.

You presume the executive branch will perform its functions in a constitutional manner unless you're faced with allegations which --

JUDGE CORRIGAN: Sure. And if I had Mr. Crews on the stand and I asked -- and I went through that letter with him, does he have backup?

Does he have, Yes, I talked to these medical experts and they told me it was fine, or, We have done a thorough investigation and here's ten peer-reviewed medical articles that say that this is a perfectly appropriate anesthetic that will render somebody unconscious within this amount of time?

And -- is there that body of information that supports that September 9th letter?

MR. BROWNE: I believe so. I cannot say I -- you know, I -- I'm not behind the executive choice in drugs at all. I'm here defending as an attorney for the defendants.

However, I will say this. It sounds like, Your Honor, you're interested -- you're going to do exactly what *Baze* said we can't do.

Courts should not be inquiring in these matters where the real choice is, Well, what would be a better practice; what might be better; what drug might be better?

The limitation that this court has is Supreme Court precedent, Eleventh Circuit precedent. He must at least make a prima facie case that the drugs that we will use will -- will likely cause him serious bodily injury and needless suffering. And it's serious injury, serious suffering.

Those allegations that you have before you right now do not warrant any further evidentiary development. This complaint should be dismissed. There is no specific allegation here that requires evidentiary development.

*Baze* addressed the issue of consciousness. There's no affidavit here, aside from one from a law professor, that supports the notion that Midazolam would not be effective to render an inmate unconscious and incapable.

JUDGE CORRIGAN: And I understand it. We're going

to follow the law. And the only thing I'll say to you is that it seems to me that if the State of Florida means what it says in that letter that the State of Florida would not be at all adverse to showing the backup to that letter: here's the investigation we did; here's why this drug is perfectly good; here's why it's medically acceptable.

And, sure, you might get challenges anyway, because, you know, a death-sentenced inmate is going to make challenges. And we understand that. But the courts are -- and this is what happened previously.

The challenge came. It was resolved in the first few cases. And then the later cases were much more summary in dealing with it, because that's the way it works.

And I guess I just -- it just seems to me -- and then I'll stop.

It seems to me that when the State of Florida sends out a two-page letter from Mr. Crews that says, This is fine -- we've looked at it, it's fine, and that's all it does, that it creates more opportunity for plaintiffs to contest it.

But I -- I know that's not your call. But it's just -- I guess I don't -- you know, if this case goes forward, there will be discovery, and all the things I'm talking about will have to come out.

And I just don't know why the State wouldn't -- wouldn't want its executions carried out pursuant to law that

it wants to fulfill -- I don't know why the State of Florida wouldn't want that information to be available so that everybody would know that the State has done a full investigation and it has made this effort and here's the deal.

JUDGE HOWARD: Go ahead.

MR. BROWNE: Your Honor, I appreciate this court's concern. And, again, as far as appearances of -- I understand your concern.

But the State also has an interest in being protected from dilatory and speculative lawsuits. And that's what we have. And we will have to expend resources based on --

JUDGE HOWARD: Isn't that the exact -- I mean, isn't that the whole point he's making? His whole point is you could spare yourselves these dilatory and frivolous lawsuits, as you've called them, by having some of the transparency, by putting some of the information out there that would foreclose these claims, like what investigation there was of the research, like the, you know -- as my colleague said, you know, ten peer-reviewed articles that say Midazolam -- is that how you pronounce it?

MR. BROWNE: Midazolam.

JUDGE HOWARD: Okay. We were -- I'm not good at medical terms. But that it is an effective anesthetic and that it will render you unconscious and that's that.

Wouldn't you have a better chance of avoiding the lawsuits if you did that than with all this shroud of secrecy? That's the point that he's trying to get at.

MR. BROWNE: I don't know if it's a shroud of secrecy. I mean, Mr. Crews indicated that he's investigated the matter.

You know, anyone can -- you know, Midazolam is not a drug that is not unknown to virtually anyone. You can look it up on RX.com and see what it does.

We don't -- I'm not sure we -- anything that we do will prohibit a lawsuit. We'll get it no matter what. We shouldn't have to. That's really the point.

They haven't made a prima facie case. And the State of Florida thinks that we should be granted judgment on these pleadings.

I don't see a sufficient single allegation in the defendant's complaint because they were challenging pentobarbital, or in their amended complaint, that creates a genuine issue of fact that needs to be resolved. And, therefore, we think the 12(b)(6) motion should be granted at this stage.

JUDGE HOWARD: All right. Ms. DeLiberato?

MS. DELIBERATO: Yes, Your Honor.

JUDGE HOWARD: So Mr. Browne is correct that the Eleventh Circuit authority is that so long as the first drug

renders you unconscious, the current protocol in the State of Florida passes constitutional muster.

And, really, what is it about the allegations that you have about Midazolam that are any different -- because a lot of them do seem kind -- kind of the same things that were the -- what the precedent says, the parade of horribles and the possibilities.

But what actual factual allegations do you have in this proposed amended complaint that this drug is not an effective anesthetic in causing lack of consciousness?

MS. DELIBERATO: Yes, Your Honor. Well, first of all, I mean, it's not --

JUDGE CORRIGAN: Could you turn your microphone on? Thank you.

MS. DELIBERATO: I'm sorry. Yes.

It's not substituting an anesthetic for an anesthetic. Pentobarbital was a barbiturate which was substituted for sodium pentothal, which was also a barbiturate.

Midazolam is an entirely different class of drugs. It's a benzodiazapine. It is not used for an anesthetic. Mr. Browne indicated that in a clinical setting it's used as an anesthetic. It's not.

It's used prior -- typically prior to the induction of anesthesia to treat and sedate a patient. It's not meant

to induce a surgical plane of anesthesia, as a typical anesthetic would be. And that's set forth in --

JUDGE CORRIGAN: Are you saying it's meant to calm somebody down in anticipation of being anesthetized?

MS. DELIBERATO: Yes, Your Honor. That's its purpose. And that is set forth in our proposal.

JUDGE CORRIGAN: And who -- what doctor says that? Why don't y'all have a doctor? Why do you have a law professor? Why don't -- if this -- if this is really what you say, why don't you have a doctor?

MS. DELIBERATO: Well, Your Honor, I think sort of twofold. First, at this stage of the proceeding, our argument is not just -- it's also the evolving standards of decency claim that Florida is now such an outlier in its three-drug protocol. Because at the time of *Baze*, no state had a one-drug protocol.

JUDGE CORRIGAN: Yeah. You're going to have trouble with that, aren't you? I mean, that really is going to be a tough one for you, isn't it?

There's really not any good authority, especially in the Eleventh Circuit, that just because Florida uses the three-drug protocol and other states use the one-drug protocol that that's going to render it unconstitutional. That's an uphill fight, isn't it?

MS. DELIBERATO: Well, Your Honor, I mean, I think

if you look at the language in *Baze* -- I mean, *Baze* itself says that a state's refusal to change its execution method can be viewed as cruel and unusual punishment in the face of other -- of other states' documented advantages to going away from the three-drug protocol. And that's exactly what we have.

JUDGE HOWARD: What has changed in the one year since I last looked at that argument and said it didn't -- it didn't survive current precedent?

MS. DELIBERATO: Actually, in 2013 alone, the -- of the number of single-drug executions versus three-drug excuses, there's only been 11 three-drug executions. Six of them were actually in Florida.

13 states -- an additional state yesterday. North Carolina just announced its intent to move to a three-drug protocol, so --

MS. PARMER: A one drug.

MS. DELIBERATO: -- a one-drug protocol. So the numbers actually have -- in the last year, their shift really is actually more dramatic, more marked in 2013.

JUDGE HOWARD: But that's asking the courts to tell the -- to tell the states how to conduct their executions, which *Baze* tells us we can't do, unless you -- unless there is a serious risk of bodily injury or needless suffering.

And just saying -- you know, just as I said to

Mr. Browne, saying other guys do it worse doesn't work with my kids, saying other people may do it better doesn't really work, as long as the protocol in the State of Florida passes constitutional muster.

I think that's what I said in *Ferguson*. And I don't know if you had addressed that in *Pardo*, but -- and that's what the Eleventh Circuit has said multiple times.

MS. DELIBERATO: And -- well, I mean, I think, Your Honor, the issue is we've got Florida -- we've got sort of two things.

Florida is clinging to this archaic method. And they're clinging to it with an experimental method that no other state in the country is using by using this drug that is not meant to be used as an anesthetic. It's a pre-sedative sedated drug.

JUDGE CORRIGAN: And that's what I was trying to get you to talk about and you pivoted right to the evolving standards of decency. And I'm trying to understand.

Is this a bad drug to use for this -- for this procedure? And is there a doctor that will say so?

I mean, otherwise, I don't know how we would -- I mean, if the State says they've looked into it -- I mean, I -- you know, I -- as I told Mr. Browne, you'd like to see more than that.

But -- but if you don't have -- if you don't have a

legal and factual basis to say that the introduction or substitution of this particular drug in the three-drug cocktail is going to cause unnecessary pain or is inappropriate for use, or whatever you want -- whatever you want to -- whatever term you want to use, how are you going to have a lawsuit?

MS. DELIBERATO: Well, and I think --

JUDGE CORRIGAN: And if the lawsuit is just about that they're not using the one-drug cocktail and the only thing that's constitutional now is the one-drug cocktail and the three-drug cocktail is an Eighth Amendment violation ab initio, that's going to be a tough sale.

MS. DELIBERATO: Well, I think the lawsuit is both. And I think we have set forth in our complaint, which at this stage of the case must be accepted by this court as true, and we're in a 12(b)(6) motion to dismiss setting, that Midazolam is not intended to be used for this purpose.

We also know the only time it was used, there was irregularities in Mr. Happ's execution. There was movement after there should [sic] have been and there was movement after the consciousness check.

JUDGE CORRIGAN: But the Supreme Court -- and this hasn't been the revolution people thought it would be. But the Supreme Court did say in *Twombly* and -- that you have to

have a plausible factual basis for making the contention you just made.

I agree with you that if you say in your complaint it's not intended to be used for it and it's -- that that's an allegation that might lead to something. But what I'm asking you -- and I recognize we're on 12(b)(6).

But I think you still have to have a Rule 11 basis and a factual basis to make that allegation. It can't just be you as a lawyer saying, I think this is a bad drug.

So who's saying it? Is there a doctor that says it?

MS. DELIBERATO: I mean, we haven't -- we haven't gotten to that point, I guess, where we -- we haven't gotten any discovery. So it's very difficult for us to, like you said, know --

JUDGE CORRIGAN: Well, but the drug is well known, right?

MS. DELIBERATO: Yes.

JUDGE CORRIGAN: I mean, this isn't a secret drug. I mean -- right?

MS. DELIBERATO: Yes.

JUDGE CORRIGAN: So there ought to be a -- a pharmacist or a doctor who can say -- and you go to them and say, Here's what's going to happen, and they're going to use this to render somebody unconscious so then they can introduce other drugs to put them to death.

Are they really going to be unconscious? And are they really not going to feel pain, or whatever -- you know, whatever. Isn't that how you would go about building a lawsuit as to this claim?

MS. DELIBERATO: I think that's one potential avenue. I think we have set forth that it's not intended to be used for this purpose. We -- certainly we could provide -- I mean, that's something that a doctor would easily say, that this is not its purpose.

JUDGE HOWARD: Okay. But there are a myriad of decisions that have said the fact that it's not intended to be used for that purpose isn't the relevant inquiry.

The relevant inquiry is whether it -- whether you can make the allegation that it's going to cause needless suffering. And -- or that it is like -- likely or substantially likely to cause serious bodily injury or needless suffering.

The Supreme Court, in sort of short shrift, dismissed the idea that just not the intended use is not enough.

And what does seem to be somewhat absent, at least in the current complaint, is the allegations, or the expert, as Judge Corrigan notes -- the basis to say that substituting this drug for the prior anesthetic is going to cause that sort of suffering.

And it seems to me -- and I'm reaching back, because *Valle* was -- was a good -- maybe four years ago. But there was an expert -- and I can't remember his name -- who gave -- whose expert report was appended to the complaint and was relied upon by the plaintiffs.

And I think that same expert gave opinions in the -- in the *Ferguson* case as to why he believed pentobarbital was insufficient and then why the substitution of the vecuronium bromide was insufficient combined with pentobarbital.

But that's lacking here, right?

MS. DELIBERATO: Yeah. I mean, we do not have an expert affidavit talking specifically, because I think -- I think you're referring to Dr. Heath.

JUDGE HOWARD: Yes. I couldn't remember his name.

MS. DELIBERATO: And my recollection -- and it's been a little while since I read those pleadings -- was that the focus of that was also that the first drug wouldn't render -- would not necessarily render unconscious, which, I mean -- the argument, I think, was the same. There was a lot of argument about improper venous access and whether it was actually properly delivered.

And all of those things are, you know, still set forth in our complaint and still very much a concern in the Florida Department of Corrections.

And we have the one execution that took place where

we know that they failed to follow their own protocol. If this Midazolam, which -- if this Midazolam does cause involuntary movement, which the State has -- the defendants have set forth in their responsive pleadings, that's a factual issue for dispute, because the State, in the execution of Mr. Happ, did not follow their own protocol, did not redo the consciousness check.

JUDGE CORRIGAN: But what -- just so I'm clear -- you're with the CCR, right?

MS. DELIBERATO: Yes.

JUDGE CORRIGAN: And that -- and we don't have one up here. You're from somewhere else, right?

MS. DELIBERATO: Tampa.

JUDGE CORRIGAN: Tampa. Right. And I can't remember why we don't have one here, but I guess the legislature did something way back when.

MS. DELIBERATO: I think they're supposed to be bringing it back.

JUDGE CORRIGAN: So I'm interested in what your budgetary -- what's your availability -- you know, I'm telling you to go get a pharmacist or go get a doctor, or go -- I mean, can you do that?

MS. DELIBERATO: We certainly -- we have a budget that our office has to appear by. I have to get approval from -- you know, from the head of our agency to expend funds

and that sort of thing.

JUDGE CORRIGAN: And I guess -- you know, I guess what -- you know, Mr. Browne says this is all frivolous and so forth. And I -- you know, I -- it would have been predictable to me that when the State of Florida -- after heavily litigating the prior protocol when they change it, it's pretty predictable that they're going to get a challenge to it.

But, you know, you are going to have to bring the goods, right? I mean, you can't -- I don't think -- I mean, you know, we'll have to figure out -- Judge Howard and I will have to figure out whether the complaint you've tried to bring now is sufficient to get past a 12(b)(6) or whether you need to redo it.

But, you know, you can't -- you aren't going to be able to just say it's not intended to be used like this and we had this one anecdotal situation and win a lawsuit, and -- I don't think you're going to be able to.

And so if it really is inappropriate to be using this drug, then it would seem like some responsible medical person would be willing to say so.

You know, I might even posit -- well, no, I won't posit that. But -- and regardless of whether the State's required to justify what they've done with medical evidence, you certainly are going to have to be able to justify your position with medical evidence. Otherwise, you're not going

to have a case, right?

MS. DELIBERATO: I certainly understand what Your Honor is saying. And I guess our position is we do believe at this point that we have nudged our claim into the plausible, which is what's set forth in the proposed amended complaint.

Obviously, if the court finds certain areas of it lacking, we'll, you know, make the necessary -- this is not a frivolous lawsuit that plaintiffs are bringing.

This is a serious and substantial change that was made without any -- as far as we can tell, without any thought whatsoever. They have Midazolam lying around so they started using it.

I mean, this is the kind of thing that just happens over and over and over again in the state of Florida. And that's something that we're trying to bring to this court's attention. And it is violative of the Eighth Amendment.

JUDGE HOWARD: You've alleged in -- you've alleged in -- I mean, I'm looking at your proposed amended complaint. And I don't -- I'm assuming they're all the same.

But you allege that Midazolam is a benzodiazapine and used for anxiety and that it's administered prior to the introduction of anesthesia.

And then you allege that it's untested and that it had never been used in an execution prior to Mr. Happ. And then you say that, on information and belief, there wasn't any

reasoned analysis before you switched to it. And then there are a bunch of allegations that if Midazolam doesn't render the individual unconscious what could happen.

But I'm not sure I see anywhere in here an allegation that -- that you believe that Midazolam would be insufficient.

And isn't that necessary, that some allegation that the plaintiff is in -- has a basis to fear that the Midazolam will not render him unconscious so that all of these other possibilities are realistic possibilities?

Because it looks to me like that -- once we pass that, the others are allegations that have been addressed at various times by the court, right?

MS. DELIBERATO: With respect to the other drugs, is what you're saying, Your Honor?

I mean, I think in paragraph 26 of the proposed amended complaint -- I mean, sort of the first sentence is the Midazolam protocol creates a substantial risk that condemned inmates will experience severe pain and suffering during an execution.

I think that was where -- I think that's where -- I think that that would be our position, that that's how we're setting forth, that it's, in fact, the Midazolam -- we're not parsing the argument that way, because we are raising this argument, as I said, that Florida continues to be this outlier

clinging to this archaic drug. So it sort of -- you have to read the complaint, I guess, in its entirety in that respect.

But I do think we set forth -- that is our position, that Midazolam -- that is one of our positions, that Midazolam is an inappropriate first drug to cause unconsciousness and that will result in substantial pain during an execution.

JUDGE CORRIGAN: Is it fair to say -- I assume that you and other people who handle death penalty litigation -- you didn't have any advanced notice of this protocol change?

MS. DELIBERATO: No. And, in fact, we were actually never served with the protocol. We -- the plaintiffs in this litigation, we happened to find out about it because another lawyer in our office got a warrant and that sort of thing.

JUDGE CORRIGAN: So you've only been dealing with this new protocol since September the 9th or so?

MS. DELIBERATO: That's correct, Your Honor. I mean, and we had this hearing -- it sort of happened that this hearing was scheduled August 26th and then the protocol was changed. So we're sort of scrambling to get as much information to the court as possible before this hearing date.

JUDGE HOWARD: That was just our luck.

JUDGE CORRIGAN: We thought about cancelling the hearing, but we decided to go forward because, you know, it -- we're going to have to deal with this one way or the other.

I noticed -- and let me ask Mr. Browne a question.

Mr. Browne, I noticed that there's another case in front of Chief Judge Conway. And I don't know if that's your case or not, but --

JUDGE HOWARD: *Sireci*.

JUDGE CORRIGAN: *Sireci.* She granted the leave to amend, right?

MR. BROWNE: Yes, Your Honor.

JUDGE CORRIGAN: And what's going on in that case? Did she lift the stay of discovery? Or is she just waiting for the amended complaint?

Because she had stayed discovery, right?

MR. BROWNE: Yes, Your Honor. That's my understanding.

JUDGE CORRIGAN: What's going on with that case?

MR. BROWNE: At this point I think they granted leave and that's where we are. There's no hearing set. No discovery either, Your Honor.

JUDGE CORRIGAN: So the stay is still in place? Is there a stay?

MR. BROWNE: In discovery, yes, Your Honor.

JUDGE CORRIGAN: And has that amended complaint been filed yet?

MR. BROWNE: I do not know. I do not believe so, based on --

JUDGE CORRIGAN: If you know, Counsel --

MS. DELIBERATO: No, Your Honor. I'm also handling --

MR. BROWNE: It has not been --

MS. DELIBERATO: We have all seven cases. It's due on Tuesday, November 12th.

JUDGE CORRIGAN: The amended complaint is?

MS. DELIBERATO: Yes.

JUDGE CORRIGAN: And is it going to say -- is it going to be exactly the same as this? Or is it going to say something different?

MS. DELIBERATO: I think counsel will probably confer and sort of --

JUDGE CORRIGAN: Okay. But it's the same issue?

MS. DELIBERATO: It's the same issue.

JUDGE CORRIGAN: And you've got one in Tampa?

MS. DELIBERATO: Yes. Who has administratively closed her case waiting for you.

JUDGE CORRIGAN: Waiting for us. And we were really happy about that, but...

MS. DELIBERATO: And we also have one in Ocala. And the one that -- Judge Hodges in Ocala has granted a similar -- he's allowed me to file a reply in a proposed amended complaint, which is also due sometime next week.

So he hasn't ruled on the -- whether I actually have leave to amend or not. But he wants to see the proposed

amended complaint.

JUDGE CORRIGAN: And why are there seven of them? What's the magic about seven, as opposed to -- I mean, I assume that potentially this could apply to any death-sentenced inmate, right?

MS. DELIBERATO: Yeah. It's sort of a structural thing with the way our office is set up. My co-counsel and I -- we have a team of clients.

And we sort of decided -- I think there may be other lawsuits that would be filed -- or could be filed, and other lawyers. But certainly these are the ones that -- these are -- we filed these seven.

JUDGE CORRIGAN: And, Mr. Browne, the State's apparently -- because you opposed consolidation, opposed anything that brings any of this together, I take it the State's not interested in trying to get this in front of a judge and getting it resolved? Or the State would rather litigate all the cases separately? Is that -- is that my understanding?

MR. BROWNE: That -- that is correct, Your Honor. Each individual case -- some -- and the reason for that -- one of the reasons is the exhaustion issue is different among defendants, but also the statute of limitations are different.

So that issue -- again, it doesn't exist in *Abdool* and *Brant;* whereas, for the other defendants it certainly is

an issue.

May I briefly address counsel's argument? Again, I --

JUDGE CORRIGAN: Sure.

JUDGE HOWARD: Sure.

MR. BROWNE: I don't want to take too much of this court's time. Counsel cites or states that Midazolam is not used for anesthesia, but there's no study, no support for that whatsoever. They don't even argue that it is an off-label use anymore, which is their complaint on pentobarbital.

You know, the information is readily available to counsel. I believe the State had not seen -- and there are other -- there is currently a warrant case out of Miami.

The State has not seen any affidavits from any expert, other than Law Professor Denno, who made an appearance or submitted an affidavit in Miami under an impending warrant, that -- regarding lethal injection.

There is no legitimate challenge to Midazolam that has been set forth in this complaint. There's no expert. There's no study cited that it would not render -- particularly in the lethal dose that it is given by the State of Florida. 250 milligrams twice is a massive dose of that drug.

There's no sufficient allegation that it will not render an inmate completely unconscious; therefore, again,

we'd respectfully request that this court grant our 12(b)(6) motion.

(Judge Corrigan confers with staff attorney.)

MR. FREEDMAN: Your Honor.

JUDGE CORRIGAN: Hold on one second.

I wanted to ask you about -- because we have a rotation here how we handle our capital cases. And I wanted to see what's coming my way here.

Are you familiar with a defendant named Muhammad?

MR. BROWNE: Yes, Your Honor. Thomas Knight.

JUDGE CORRIGAN: Because he was -- I did the habeas on him. And he's now -- as I understand it -- that's why I was asking the staff attorney to make sure what we understood.

I understand he's actually raised this lethal injection challenge in state court; is that correct?

MR. BROWNE: Yes, Your Honor.

JUDGE CORRIGAN: And do y'all represent him?

MS. DELIBERATO: We do not.

JUDGE CORRIGAN: Okay. So -- and the state court has denied it. And now it's up with the Florida Supreme Court?

MR. BROWNE: That is correct, Your Honor. The circuit court denied it without a hearing.

JUDGE CORRIGAN: So I'm likely to get, possibly, a federal lawsuit in the next -- if the Florida Supreme Court

denies relief, I'm likely to get a federal lawsuit, or possibly will get one, and I'll have to decide all this -- instead of deciding it the way we might decide it in this case, I'm going to have to do it the way we normally do it, which is we get two days and I have to do it in 18 hours so I can get it up to the circuit and so forth, maybe, or maybe there's a stay.

You know, who knows? But you -- it's possible -- the chain -- I guess what I'm trying to figure out is -- are you the lawyer in his case?

MR. BROWNE: No, Your Honor, I'm not.

JUDGE CORRIGAN: Who is?

MR. BROWNE: Sandra Jaggard.

JUDGE CORRIGAN: Okay. And she's in your office?

MR. BROWNE: She's in the Miami office, Your Honor, yes.

JUDGE CORRIGAN: Okay. So as far as you know, is the same type of allegations that are being made in this proposed amended complaint being made in front of the state court?

MR. BROWNE: Yes, Your Honor, virtually identical.

JUDGE CORRIGAN: Okay. And do you know -- do they have any -- are you aware -- and I recognize this is not your case.

Are you aware of any further evidentiary treatment

or any expert that's been put forward by the lawyers in that case?

MR. BROWNE: No, Your Honor. Just Professor Denno and her opinion on capital punishment.

JUDGE CORRIGAN: So it's going to be kind of the same -- right now it would look exactly the same as this?

MR. BROWNE: Unless they can procure an expert. And I do not believe, again --

JUDGE CORRIGAN: Well, yeah, you don't know what they'll do.

MR. BROWNE: I'm not going to speculate.

JUDGE CORRIGAN: And I don't even know if I'll get a suit. It just occurred to me that we're having this discussion and we're talking about -- but I may actually have this in a week or so in front of me.

MR. BROWNE: Yes, Your Honor. I would say that's a very good possibility.

JUDGE CORRIGAN: Okay.

(Judge Corrigan and Judge Howard confer.)

JUDGE HOWARD: We are going to take a brief recess. And if you'll just indulge us to confer, we will join you shortly.

COURT SECURITY OFFICER: All rise.

(Recess, 11:11 a.m. to 11:17 a.m.)

COURT SECURITY OFFICER: All rise. This Honorable

Court is now in session. Please be seated.

JUDGE HOWARD: Mr. Freedman, I think that Judge Corrigan is recalling that there was something that you may have wanted to add earlier and we didn't quite let you do that. Is there something that --

MR. FREEDMAN: Thank you. I appreciate that.

I just was going to say, Your Honor, in respect to efficient utilization of experts, it makes a lot more sense in getting an expert opinion to be able to hand the expert a certain set of facts.

We can -- if we say, Well, if X and so happens with Midazolam and X and so happens, they will rightfully attack that as speculative.

It it's done in execution and they haven't yet told us -- although they're supposed to keep logs and we look forward to receiving them -- at what time the thing was administered, when the next one came in -- for all I know it's perfectly true, as counsel says, that -- it would be great if administered in a certain time frame and then the prisoner is unconscious and then it's great.

We don't have any knowledge how they are doing it. Maybe, quite possibly, we'll get an expert that says, Yes, that's true, but they're not giving it enough time to take effect.

So with reasonable discovery, as suggested in the --

JUDGE CORRIGAN: You know, it's always the question of whether you've got the cart before the horse, though. I mean, I recognize this is capital litigation.

And, you know -- you know, and that carries with it a different -- a different tinge. But, you know, you can't -- I don't think you can just file a complaint to say they've changed the protocol and so we've got a lawsuit.

MR. FREEDMAN: With respect, Your Honor, it's several more things than that. It alleges that they haven't done a study, which is itself of considerable -- which is itself a basis for a complaint, and it alleges that -- and I think this absolutely pushes it over the line of plausibility that on the first occasion when this thing was used there were causes for concern.

That's what we need. You know, a probability that there's a problem. That pushes it over the line.

Now, let's have discovery and, you know --

JUDGE CORRIGAN: Remind me -- remind me what publicly available information is there -- remind me what publicly available information is there after a -- after an execution. Is there a medical report filed? Is there a -- because there is a -- there is a --

MR. FREEDMAN: There's a log supposed to be kept of the administration of each drug. And co-counsel is a lot more familiar with the protocol.

MS. DELIBERATO: Well, there's a lot of things that are supposed to happen. There's an autopsy report that's conducted, that sort of thing.

I will tell this court that public records requests have been filed in various state courts in the state of Florida after the Happ execution.

And the State has objected to every single public records request regarding any documentations from the medical examiner, any of the logs from the FDLE.

JUDGE CORRIGAN: So that's not normally available?

MS. DELIBERATO: It's -- Florida has a very broad public records law in some respects and then not in other respects.

And in capital post-conviction litigation, you have to go through a certain procedure, which other litigants in the state of Florida, not myself or my co-counsel, have done.

And they've all been objected to by the State. And none have been provided at this point. They're awaiting various hearings. So there has been -- it's been asked and --

JUDGE CORRIGAN: Mr. Browne, why would the State of Florida not readily give up that information?

MR. BROWNE: Your Honor, peculiar to Rule 3851, when you make a public records request, it has to be related to a colorable claim.

And if they certainly state a sufficient basis for

it, the various judges and the various circuits will order it released. But they -- you know, the -- but the --

JUDGE CORRIGAN: Well, when you say they will order it released, I'm sure if the State of Florida went in and said, We don't have any objection, they would be happy to order it released, right?

I guess I'm wondering why the State of Florida is objecting to medical information, or whatever information is being sought about a public execution carried out by the State of Florida. Why -- why is that a secret?

MR. BROWNE: Well, I don't know that it's a secret. I think it's that they haven't made a preliminary showing that it would lead to a colorable claim. Again --

JUDGE CORRIGAN: Why would they have to?

MR. BROWNE: -- you're just --

JUDGE CORRIGAN: Why would they have to?

MR. BROWNE: Well, Your Honor, I think we should be protected, the State, from burdensome requests in Rule 3851. There are some judges who will order it released, certainly. But I think they need to make the preliminary showing.

JUDGE CORRIGAN: How it burdensome on the State to produce logs of the execution in a medical autopsy report and a medical -- I mean, how is that burdensome? I mean, you don't do that many executions. So how --

MR. BROWNE: Well, Your Honor, I don't speak for the Medical Examiner's Office. They have their own attorney and their own method. So I'm not sure -- I do not respond --

JUDGE CORRIGAN: Who does?

MR. BROWNE: -- if there's been a request.

JUDGE CORRIGAN: Who does?

MR. BROWNE: The Medical Examiner's Office, because the records request goes directly to the medical examiner.

JUDGE CORRIGAN: And they have lawyers that object on behalf -- I mean, it's not the Attorney General that's objecting?

MR. BROWNE: Your Honor, I will certainly join in an objection if I think it warranted. I can't speak to any -- I may have a hearing coming up in the *Lightbourne* case in Ocala. I may file an objection joining with the medical examiner --

JUDGE CORRIGAN: Why?

MR. BROWNE: -- at that point.

JUDGE CORRIGAN: Why?

MR. BROWNE: I think it's -- they haven't shown any reason to even get the records. I mean, it's pretty clear that the inmate died. It was lethal injection. And I don't know that the autopsy report would show anything. And, again, I think it's up to the individual --

JUDGE CORRIGAN: I read something, too, about -- does this protocol -- and I read it, but I don't have it

memorized. Does this protocol have something about if there's a problem that they close the curtains?

MR. BROWNE: If -- if they need a consultation or a venous access or -- yeah. I do believe at some point there is -- they would close the curtains. That did not happen in the Happ execution.

JUDGE CORRIGAN: I understand. But -- and the purpose of that is what? To close the curtains, why is that in the protocol?

MR. BROWNE: You know, I'm not sure.

JUDGE CORRIGAN: Because isn't the whole -- isn't the whole point of the -- because there's -- under state law there have to be witnesses to the execution, right?

MR. BROWNE: Yes, Your Honor. And if there is a cut-down procedure, I believe they might not want to do that in front of the victim's family members, who are often in attendance on the third row. In fact, most executions they are. So there are reasons for that, Your Honor, I'm sure.

JUDGE CORRIGAN: Okay. Mr. Freedman, did you have anything else you wanted to say?

MR. FREEDMAN: No, Your Honor.

JUDGE HOWARD: All right. Let me ask this about -- currently before the court in each of the cases there are motions to dismiss that are directed at the original -- whether it's the original complaint -- or I think in

Mr. Jackson's it's an amended complaint.

But I think we could all agree that those complaints -- regardless of whatever arguments the State has made as to those, they are all moot at this point, because that procedure isn't going to be used, right?

MS. DELIBERATO: That's correct, Your Honor.

MR. FREEDMAN: Yes, Your Honor.

JUDGE HOWARD: Okay. All right. So here's what we're going to do. I'm going to go case by case and I'm going to tell you-all what we're going to do with the current pending motions. I'm going to start with *Jackson*.

It still says *versus Singer* on the docket. Can somebody please correct -- do whatever we need to do to get the right defendant in there?

There is currently a motion to dismiss which is due -- and that is Document No. 36. It's to dismiss the third-amended complaint.

Counsel agrees that the third-amended -- the claims brought in the third-amended complaint are moot. So the motion, document 36, is due to be granted, based on the mootness of the complaint.

There is -- there's a motion for miscellaneous relief to allow a reply to the government's -- or to the plaintiff's response. That's moot. That's -- Document No. 41 is moot.

There's the motion for leave to amend. And based upon our discussions here today, it is Judge Corrigan's and my belief that the motions for leave to amend in this case -- and I'm going to go through all of them -- are due to be denied without prejudice to plaintiff filing a subsequent motion or a renewed motion for leave to amend, with perhaps a revised complaint.

You don't need all that case law in your complaint, but I think you should be given an opportunity to flush out the allegations based upon the dialogue that we've had here today.

So the motion for leave to file an amended complaint, Document No. 44 in Mr. Jackson's case, is denied without prejudice.

Ms. DeLiberato, how long do you need -- do you need for -- to craft your proposed amended complaint?

MS. DELIBERATO: I'd probably ask for 60 days, Your Honor. That would also make sure that exhaustion is complete at that point. Just on the -- in the abundance of caution, I think exhaustion will be complete in all the cases by 60 days.

JUDGE HOWARD: Okay. And that's good with you, right, Mr. Browne?

MR. BROWNE: No objection, Your Honor. There's no pending warrants on these defendants.

JUDGE HOWARD: Okay. So we'll -- we'll give you 60

days to file a renewed amended complaint. We also have the motion to stay discovery or, in the alternative, to extend time to respond. And that's Document No. 37.

The court will grant that motion pending resolution of any subsequently filed motion to amend. Those are the...

(Judge Corrigan and Judge Howard confer.)

JUDGE HOWARD: Yes, Mr. Browne?

MR. BROWNE: Your Honor, may I have 30 days to respond?

JUDGE HOWARD: That's just what His Honor was suggesting that we might want to do. So absolutely.

MR. BROWNE: Thank you, Your Honor.

JUDGE HOWARD: Why don't we go ahead and say 30 days to respond and you can file a reply within 15 days.

MS. DELIBERATO: And just so that I'm clear, Your Honor, I'm filing a motion for --

JUDGE HOWARD: I mean -- sorry. He's going to have 30 days to file any -- any response to your motion to amend.

MS. DELIBERATO: And my motion to amend will attach the proposed amended complaint?

JUDGE HOWARD: Absolutely.

MS. DELIBERATO: Okay. I just wanted to make sure I understand what I'm filing in 60 days.

JUDGE HOWARD: Okay. So within 60 days we will have a motion to amend which attaches a proposed amended complaint.

MS. DELIBERATO: Yes.

JUDGE HOWARD: 30 days thereafter, we will have a response to the motion to amend. And then plaintiff may have 15 days to file a reply. If anything falls on the weekend, go to the following Monday.

All right. Those -- I believe those are all the pending motions in *Jackson*.

Okay. So I'm turning next to *Abdool*. In *Abdool*, there's still, since April, a motion for leave to proceed in forma pauperis. Of course that's granted.

There's a motion to consolidate the cases. That's Document No. 8.

I'm sorry. The motion to proceed IFP is Document No. 3.

No. 8 is the motion to consolidate the cases. It's called a motion to consolidate. But when you actually read the content of the motion, it's all about Rule 20, and joinder. And that's -- it's just not the proper posture at all. And so it's going to be denied without prejudice.

If -- if -- once we get proper -- if amended complaints ultimately are filed, then a motion to consolidate can be brought under Rule 42 at that time. But the motion to consolidate, No. 8, is denied at this -- denied without prejudice at this time.

Document No. 9, which is the motion to dismiss the

complaint, is granted, because the complaint -- the claims stated in the current complaint are moot.

The -- there is a -- there was an unopposed motion for miscellaneous relief that is to accept a -- the response in opposition to the motion to consolidate out of time.

That -- well, that can be granted nunc pro tunc, I guess, or it can be denied as moot. I'll just say it's granted nunc pro tunc so it's in the record.

19 is the motion for leave to file the amended complaint. For the reasons that we expressed earlier, we believe that the plaintiffs should be given an opportunity to seek leave to file an amended complaint.

But the current motion is due to be denied without prejudice to filing a renewed motion. All of the same deadlines and time frames will apply.

The -- sorry. That's -- Document No. 19 is the motion for leave to file the amended complaint.

Document No. 10 is the motion to stay discovery. And that will be granted, to the extent that discovery is stayed, until the court has resolved any subsequently filed motion to amend.

And I believe that is all the pending motions in the *Abdool* case.

Next I'm going to address Mr. Nixon.

We have a motion to consolidate the cases. That's

Document No. 10. That motion is due to be denied for the same reasons it's brought under -- it's really brought as a motion for joinder under Rule 20.

It should properly be considered under Rule 42. And so it's denied without prejudice to renewal at a later date.

There is Document No. 11, which is the motion to dismiss the complaint. Because the -- it is agreed that the claims raised in the complaint are moot, that motion is granted.

Obviously, the grants of these motions to dismiss in *Abdool*, in *Singer*, and in *Nixon* are granted, to the extent that the current complaints are dismissed without prejudice on the mootness grounds only. That's the only ground that the court is addressing at this point in time.

There is a motion for leave to file an amended complaint. That's Document No. 23. That motion is, for the same reasons, denied without prejudice to plaintiffs filing a subsequent motion seeking leave to amend a -- the complaint, attaching the proposed amended complaint within 60 days, with the State 30 days to respond, and the plaintiff 15 days to reply.

And there is the -- I'm sorry. That was Document No. 23.

And we have Document No. 13, which is a motion to stay discovery or to -- or, in the alternative, to extend time

to respond.

That motion will be granted to the extent that discovery is stayed in this case until such time as the court resolves any subsequently filed motion to amend the complaint.

And with Judge Corrigan's permission, I'm going to announce the rulings in *Brant versus Palmer*. The motion to consolidate, which is No. 9, for the reasons I've previously stated, are -- is denied without prejudice to plaintiff at a subsequent time, if it is appropriate, filing a renewed motion to consolidate, addressing Rule 42 and the appropriate standard under Rule 42.

Document No. 10 is the motion to dismiss the complaint. It has been agreed by the parties that they -- that -- well, it has been agreed by the plaintiff that the current complaint -- that the claims raised in the current complaint are moot.

And, on that basis, the court will grant the motion to dismiss the complaint without prejudice on mootness grounds.

Document No. 21 is the motion for leave to file an amended complaint. The court will deny the motion to file the current proposed amended complaint, but does so without prejudice to plaintiff filing a renewed motion to amend the complaint within 60 days. The State has 30 days to respond to that. And plaintiff will have 15 days to reply.

And then going back to the motion to stay discovery, which is Document No. 13, given the posture of the case, as there is no actual complaint currently, the court grants the motion to stay discovery, pending -- to the extent that the motion -- that all discovery is stayed, pending resolution of any subsequently filed motion to amend the complaint.

Did I miss anything?

MS. DELIBERATO: I don't think so, Your Honor.

MR. BROWNE: I don't believe so, Your Honor.

(Judge Corrigan and Judge Howard confer.)

JUDGE CORRIGAN: I want to -- and I'm speaking only for myself right now. I agree fully with these rulings that Judge Howard has announced.

We both agree on them. And I think we both generally agree on -- on where we're headed here, but -- but I'm speaking only for myself here now.

We -- I feel -- I don't agree, I don't think, with Mr. Browne's characterization of these challenges as being frivolous. That doesn't mean that they're going to be meritorious either. But I don't think they're frivolous.

And I think that since the State of Florida has changed its protocol, especially as to the consciousness drug, which is the one that gets the most attention in these processes, that a well-placed challenge may well be appropriate.

And so I don't -- I don't at all agree that we're kind of wasting our time here. I don't. And I do think there's something to commend itself to these particular cases, because there is no active warrant pending, and it can be handled in a way that is the way we usually like to do things, which is be able to have the time and the ability to consider matters in a deliberate fashion rather than on an emergency basis, which is what generally faces us in these cases.

And so I think -- I think that's right. What I don't prejudge at all is the merit of the case. I think what we are -- what I'm saying -- and I think what Judge Howard is saying, but I'll let her speak for herself if she thinks differently.

I think we're saying to the plaintiff, We've raised a number of concerns, the State's raised a number of concerns, they are concerns that need to be considered, and we are open to allowing a new complaint to be filed that makes the -- the best effort to -- to bring a case and state a cause of action.

I'm sure the State will oppose it. And we will consider it on its merit. And that's really all we're saying with these rulings.

And so that's -- that's all I wanted to say.

JUDGE HOWARD: I think I am in complete agreement. What we will tell you-all is that we really -- we appreciate your -- I mean, you give us very well-researched pleadings.

And your -- it's obvious that you take this very seriously. And we appreciate your efforts.

And I know that we're -- we're asking you-all some difficult questions, but we're just -- you know, it's a very important area of the law. And we want to make sure that we fully understand each of your positions. And we are anxious to give you rulings that are consistent with what our constitution requires.

JUDGE CORRIGAN: Is there anything else from anybody? Okay.

MS. DELIBERATO: I don't think so, Your Honor. Thank you.

MR. BROWNE: No, Your Honor.

MR. FREEDMAN: Thank you.

COURT SECURITY OFFICER: All rise.

(The proceedings concluded at 11:37 a.m.)

\- - -

**CERTIFICATE**

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.

DATED this 14th day of November 2013.

s/Shannon M. Bishop

Shannon M. Bishop, RMR, CRR