**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHARLES G. BRANT,

      Plaintiff,

v.                                                                   Case No.  3:13-cv-412-MMH-JBT

DAVID ALLEN,[1] in his official capacity
as the Warden of Florida State Prison,
and RICKY D. DIXON, in his official
capacity as the Secretary, Florida
Department of Corrections,

      Defendants.

_____

FRED ANDERSON, JR.,

      Plaintiff,

v.                                                                   Case No.  3:14-cv-1148-MMH-JBT

DAVID ALLEN, in his official capacity as
the Warden of Florida State Prison, and
RICKY D. DIXON, in his official capacity
as the Secretary, Florida
Department of Corrections,

      Defendants.

_____

---

[1] In all four actions discussed in this Order, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Court substitutes David Allen for Barry Reddish as the proper party Defendant as the Warden of Florida State Prison and Ricky D. Dixon for Mark Inch as the proper party Defendant as the Secretary of the Florida Department of Corrections.

ETHERIA V. JACKSON,

     Plaintiff,

v.                                       Case No. 3:14-cv-1149-MMH-JBT

DAVID ALLEN, in his official capacity as
the Warden of Florida State Prison, and
RICKY D. DIXON, in his official
capacity as the Secretary, Florida
Department of Corrections,

     Defendants.

_____

WILLIAM ROGER DAVIS,

     Plaintiff,

v.                                       Case No. 3:18-cv-353-MMH-JBT

DAVID ALLEN, in his official capacity as
the Warden of Florida State Prison, and
RICKY D. DIXON, in his official
Capacity as the Secretary, Florida
Department of Corrections,

     Defendants.

_____

## <u>ORDER</u>

Plaintiffs, Charles G. Brant, Fred Anderson, Jr., Etheria Jackson, and William Roger Davis, are death row inmates of the Florida penal system who have initiated, through counsel, nearly identical actions challenging the constitutionality of Florida's lethal injection protocol under 42 U.S.C. § 1983. See Brant v. Allen, No. 3:13-cv-412-MMH-JBT (Brant); Anderson v. Allen, No. 3:14-cv-1148-MMH-JBT (Anderson); Jackson v. Allen, No. 3:14-cv-1149-MMH-JBT (Jackson); Davis v. Allen, No. 3:18-cv-353-MMH-JBT (Davis). Brant is proceeding on a First Amended Complaint, see Brant (Doc. 102);

Anderson is proceeding on a Second Amended Complaint, see Anderson (Doc. 57); Jackson is proceeding on a Second Amended Complaint, see Jackson (Doc. 62); and Davis is proceeding on his original Complaint, see Davis (Doc. 1) (collectively Complaints). The Complaints are nearly identical. As Defendants, Plaintiffs sue David Allen in his official capacity as the Warden of Florida State Prison, and Ricky D. Dixon in his official capacity as the Secretary of the Florida Department of Corrections (FDOC). As relief, Plaintiffs seek, inter alia, temporary, preliminary, and permanent injunctive relief prohibiting Defendants from executing them using the current lethal injection protocol, and an order declaring the existing lethal injection protocol unconstitutional.

Before the Court are Plaintiffs' identical Motions to Compel. See Brant (Doc. 132); Anderson (Doc. 85); Jackson (Doc. 89); Davis (Doc. 46) (collectively Motions); with exhibits, see Brant (Docs. 132-1 through 132-7); Anderson (Docs 85-1 through 85-7); Jackson (Docs. 89-1 through 89-7); Davis (Docs. 46-1 through 46-7) (collectively Motions Ex.). Defendants filed identical responses opposing the Motions. See Brant (Doc. 139); Anderson (Doc. 92); Jackson (Doc. 96); Davis (Doc. 55) (collectively Responses); with exhibits, see Brant (Docs. 139-1 and 139-2); Anderson (Docs. 92-1 and 92-2); Jackson (Docs. 96-1 and 96-2); Davis (Docs. 55-1 and 55-2) (collectively Responses Ex.). Plaintiffs filed identical replies. See Brant (Doc. 142); Anderson (Doc. 95); Jackson (Doc. 99); Davis (Doc. 58) (collectively Replies). The Motions are ripe for review.

## I.    Background and Procedural History

In January 2017, the FDOC changed all three drugs used in its previous lethal injection protocol and implemented the most recent three-drug mixture providing for intravenous administration of (1) etomidate (a sedative), (2) rocuronium bromide (a

3

paralytic agent), and (3) potassium acetate (a substance to stop the heart) (Etomidate Protocol).[2] Following the FDOC's 2017 change, Davis initiated his action and Brant, Anderson, and Jackson filed amended complaints asserting that the Etomidate Protocol, both as written and as applied, poses a substantial risk of serious harm to Plaintiffs in violation of the Eighth Amendment's proscription against cruel and unusual punishment. Specifically, Plaintiffs assert that the drug combination used in the Etomidate Protocol raises a substantial risk that they will suffer unnecessary pain during execution. According to Plaintiffs, to not suffer, or face a risk of suffering, etomidate must adequately and fully render them unconscious throughout their executions. They contend, however, that etomidate is an inadequate anesthetic because its ultra-short sedating effects cannot ensure that they will remain unconscious and insensate to the paralytic properties of the second drug or the noxious stimuli of the third drug. Plaintiffs assert that if etomidate wears off before the execution is complete, they will experience a sense of suffocation or drowning after the administration of rocuronium bromide and then the intense burning sensation of potassium acetate before it stops the heart. Plaintiffs also contend that etomidate causes severe pain upon injection and contains no analgesic properties.

Plaintiffs next assert that Defendants' written lethal injection protocol exacerbates the risk of serious harm associated with etomidate. According to Plaintiffs, the protocol

---

[2] In February 2019, Inch issued a periodic recertification letter to Governor DeSantis adopting the Etomidate Protocol in the same form as implemented by his predecessor in 2017. See Brant (Doc. 139-2); Anderson (Doc. 92-2); Jackson (Doc. 96-2); Davis (Doc. 55-2). In May 2021, Inch again issued a periodic recertification letter to Governor DeSantis along with the FDOC's updated written lethal injection protocol, which supersedes the FDOC's previous February 2019 lethal injection procedure. See Certification Letter from Sec'y Mark S. Inch to Governor Ron DeSantis (May 6, 2021) (available at www.dc.state.fl.us); see also Brant (Doc. 143-1); Davis (Doc. 59-1). The May 2021 updated written lethal injection protocol is seemingly identical to its 2017 and 2019 predecessors and contains the same three-drug cocktail.

overlooks how etomidate's short-term anesthetic properties affect the consciousness test. They explain that etomidate causes involuntary movements, or myoclonus, that will make the consciousness check more difficult and time consuming. Plaintiffs also allege that the mixing of rocuronium bromide and etomidate will cause precipitation, resulting in incomplete drug delivery and loss of the IV tube during the procedure. Last, in their first claim for relief, Plaintiffs maintain that the current protocol does not require execution personnel to undergo training on the effects of etomidate.

In their second claim for relief, Plaintiffs contend that Defendants' refusal to adopt a one-drug protocol violates the evolving standards of decency encompassed in the Eighth Amendment. According to Plaintiffs, most states that still recognize the death penalty have switched to a one-drug protocol, and seventy percent of the executions completed in 2018 did not include the use of a paralytic. Plaintiffs identify "a single dose of non-compounded or properly compounded pentobarbital as the readily available alternative to the [s]tate of Florida's current unconstitutional protocol." Plaintiffs aver that other states such as Texas, Missouri, Georgia, and South Dakota have the ability to obtain properly compounded pentobarbital and have used this proposed single dose of pentobarbital to execute a combined sixty-six[3] condemned inmates. They also contend that California and Kentucky have recently proposed one-drug protocols demonstrating a national consensus toward this alternative procedure. Plaintiffs assert that a single dose of pentobarbital is a feasible, readily available alternative that would significantly reduce the substantial risk associated with Florida's three-drug protocol.

---

[3] Jackson, who filed his Second Amended Complaint before Brant and Anderson, alleges that these states have executed a combined sixty-four prisoners using this proposed one-drug protocol. Jackson SAC ¶ 80.

Defendants sought to dismiss Plaintiffs' Complaints, and the Court denied Defendants' motions to dismiss, finding Plaintiffs sufficiently pled a plausible Eighth Amendment claim and permitted Plaintiffs to engage in discovery. See Brant (Doc. 115); Anderson (Doc. 73); Jackson (Doc. 77); Davis (Doc. 30). Plaintiffs served Defendants with interrogatories and requests for production. Motions at 2. Plaintiffs now move under Federal Rule of Civil Procedure 37(a)(3)(B) to compel the production of documents and information. See generally Motions.

## II.     Standard of Review and the Eighth Amendment

A party may obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The Eleventh Circuit has instructed that "[e]vidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action." Aycock v. R.J. Reynolds Tobacco Co., 769 F.3d 1063, 1068 (11th Cir. 2014). Here, to determine the relevance of the information Plaintiffs seek, the Court must consider the elements they must establish to prove their Eighth Amendment claim. To prevail on their Eighth Amendment method-of-execution claim, Plaintiffs must show: (1) that Florida's method of execution "presents a risk that is 'sure or very likely to cause serious illness and needless suffering,' and gives rise to 'sufficiently imminent dangers,'" Price v. Comm'r, Dep't of Corr., 920 F.3d 1317, 1325-26 (11th Cir. 2019) (quoting Glossip v. Gross, 135 S. Ct. 2738, 2737 (2015); Baze v. Rees, 553 U.S. 35, 50 (2008)); and (2) that there is "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." Id.

(quoting Bucklew v. Precythe, 139 S. Ct. 1112, 1125 (2019)). If the information is relevant to those two elements, the Court must then consider proportionality, including "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

The Court "is given wide discretion in setting the limits of discovery, and its judgment will be overturned only when a clearly erroneous principle of law is applied or no evidence rationally supports the decision." Aycock, 769 F.3d at 1068 (internal citation omitted). To that end, the Court's Local Rules and the Federal Rules of Civil Procedure state that in a civil action, counsel must make a good-faith attempt to resolve discovery-related issues before seeking the Court's intervention. See Local Rule 3.01(g); Fed R. Civ. P. 26. The Court will entertain a motion on matters which remain in controversy only if, after consultation and sincere attempts to resolve the differences, the parties cannot reach an agreement. See S.L. Sakansky & Assocs., Inc. v. Allied Am. Adjusting Co. of Fla., LLC., Case No. 3:05-cv-708-J-32MCR, 2007 WL 2010860, at *1 (M.D. Fla. July 6, 2007) ("Discovery is intended to operate with minimal judicial supervision" and "should be practiced with a spirit of cooperation and civility."). The party resisting discovery through Rule 26 objections must be sufficiently specific and allege more than a mere conclusory "recitation of expense and burdensomeness." Panola Land Buyers Ass'n v. Shuman, 762 F.2d 1550, 1559 (11th Cir. 1985). If the Court finds that one or both parties faltered in their discovery obligations, it has discretion, under Rule 37(a), to compel appropriate discovery responses. Fed. R. Civ. P. 37(a)(1); see Commercial Union Ins. Co. v. Westrope, 730 F.2d 729, 731 (11th Cir. 1984) ("Case law states that a motion to compel discovery is committed to the discretion of the trial court . . . .").

### III.    Analysis

In their Motions, Plaintiffs assert that out of their fourteen interrogatories, "Defendants refused to answer any with information other than that contained within the publicly available lethal injection protocols; [and] out of the thirty-one requests for production[], [D]efendants produced just three documents" – (1) the public testimony of Stephen Whitfield, Chief of Pharmaceutical Services at the FDOC, given in <u>State v. Long</u>, No. 1984-CF-13346 (Fla. 13th Cir. Ct.); (2) the FDOC's 2017 written lethal injection protocol; and (3) the FDOC's 2019 written lethal injection protocol. Motions at 5-6. Plaintiffs also assert they met and conferred with Defendants, during which "Defendants refused to engage in any meaningful discussion" about their discovery requests. <u>Id.</u> at 37. In their Responses, Defendants make blanket arguments that nearly all of Plaintiffs' discovery requests are irrelevant, fishing expeditions that would not lead to pertinent information or establish a cognizable Eighth Amendment claim. <u>See generally</u> Responses. The Court addresses each of the contested requests in turn.[4]

> **A.    Source of lethal injection drugs**: manufacturer information (interrogatories 1, 5, 8); pharmacy, vendor, or other source information (interrogatories 3, 7, 10); and documents regarding source, availability, and manufacturer information (requests for production 1, 5, 7)[5]

In interrogatories 1, 5, and 8, Plaintiffs ask Defendants to identify the manufacturers of each of the three drugs used in the FDOC's lethal injection protocol. Motions at 9-15. In interrogatories 3, 7, and 10, they ask for Defendants to identify "by

---

[4] The Court addresses Plaintiffs' requests based on commonality and categorizes them in the same groups as set forth in the Responses.

[5] In Plaintiffs' request for production 1, they also request documents regarding the quantity and expiration dates of the drugs in the lethal injection protocol. <u>See</u> Motions at 31. The Court addresses that request separately in section "B."

name and address" the pharmacy, vendor, or other source the FDOC uses to obtain the three drugs. Id. at 19-22. And their requests for production 1, 5, and 7 ask for all documents regarding the source, availability, manufacturer, supplier, and any documentation regarding the acquisition of the three drugs. Id. at 31-38, 43-44. Plaintiffs' relevancy arguments for these requests are similar. They assert this information would show if the drugs were obtained from an FDA-approved or DEA-approved source or supplier and whether the manufacturers or suppliers have faced health complaints or drug recalls. Id. at 10, 20, 32. According to Plaintiffs, if the drugs used are not manufactured by an FDA-approved source, such drugs could have inadequate potencies, efficacies, safety, stability, or consistencies, subjecting Plaintiffs to a substantial risk of harm. Id. at 10, 20, 32. Plaintiffs also assert information about the pharmacy/supplier may show if the drugs are being improperly stored before the FDOC receives them. Id. at 20, 21. In support of this contention, Plaintiffs cite news articles about other states (Arizona, Nebraska, Oklahoma, and Texas) obtaining drugs from "sources that raise grave concerns about the purity and efficacy of the execution drugs." Id. at 10, 20. They also attach the FDOC's response to a public records request containing pharmacy addresses, which Plaintiffs argue shows that "secrecy is not necessary." Id. at 21; Motions Ex. 2. And they cite a 2014 press release about the recall of ten lots of etomidate "due to the [p]resence of [p]articulate [m]atter and/or illegible and [m]issing [l]ot [n]umber or [e]xpiry [d]ate," and a 2017 FDA recall of rocuronium bromide due to "[p]otential [c]ontamination." Motions at 33.

They also contend that if the FDOC "receives its execution drugs from a supplier and/or manufacturer that also supplies or manufactures alternative, less painful drugs,

this information has bearing on the feasibility and ready implementation of an alternative method of execution," and shows whether the FDOC's refusal to use an available alternative drug has a legitimate penological reason. Id. at 34. Plaintiffs assert that during discovery discussions with Defendants, they suggested that a protective order or redactions would handle any concern over disclosing sensitive information. Id. at 15. But according to Plaintiffs, "Defendants refused to engage in any meaningful discussions in this area." Id. at 37.

In their Responses, Defendants assert "the source of the drugs and whether or not a drug has received FDA approval is of questionable relevance to an Eighth Amendment challenge." Responses at 6 (citing Brewer v. Landrigan, 562 U.S. 996 (2010)). According to Defendants, it is not enough for Plaintiffs to show that the FDOC may obtain defective drugs, but rather they must show there is a substantial risk that the defective drugs will be used during Plaintiffs' executions, causing "'serious illness and needless suffering.'" Id. at 7 (quoting Gissendaner v. Comm'r, Ga. Dep't of Corr., 803 F.3d 565, 575 (11th Cir. 2015)). Defendants also argue that source information has little relevance to Plaintiffs' argument that the information may lead to "alternative, less painful drugs, such as pentobarbital." Responses at 8. Defendants contend that in their Complaints, Plaintiffs only named pentobarbital as an available alternative, thus any other drugs produced by the manufacturer or source the FDOC uses is irrelevant to Plaintiffs' claim. Id. Likewise, they assert that obtaining source information would not prove that the FDOC could even obtain pentobarbital for executions. Id. at 9.

Instead, Defendants argue this disclosure would "disturb the distribution of lethal injection drugs and the state's ability to carry out sentences." Id. To that end, they contend

production of this information would be unduly burdensome. Id. at 10. According to Defendants, the state has a significant interest in keeping supplier identification information private to protect its drug supply and its employees. Id. at 9. They maintain that when manufacturer or seller information is revealed, death penalty opponents target the manufactures to advocate against supplying the drugs for lethal injections, leading to those drugs becoming unavailable and forcing the FDOC to change its lethal injection protocol. Id. at 3-5. In support of that argument, Defendants reference FDOC employee Stephen Whitfield's May 2019 testimony in Long, No. 1984-CF-13346, in which Whitfield stated the FDOC used pentobarbital in its past protocol. Id. at 9 (citing Responses Ex. A). But, according to Whitfield, when the manufacturer of pentobarbital decided it did not want pentobarbital to be used in lethal injections and refused to provide or sell the drug to the FDOC, the FDOC was forced to change its protocol and switch to another drug. Responses Ex. A at 6. To highlight the state's interest in keeping this information private, Defendants assert that Florida implemented section 945.10(1)(g), Florida Statutes, which maintains the confidentiality of any person prescribing, preparing, compounding, dispensing, or administering drugs for lethal injection. Id. at 9-10. Florida also implemented section 945.10(1)(e) and Chapter 2000-1, section 1 to prohibit the release of any information that would jeopardize the safety of those individuals, including identifying information. Id. at 10. Defendants assert that a protective order would not prevent the dissemination of this information as Plaintiffs' counsel work at the Federal Public Defender's Office and two private law firms, and allowing this discovery would influence discovery requests in other death cases. Id. at 5-6.

At this point, the Court cannot say information about the manufacturers, pharmacy, or source of the FDOC's lethal injection drugs is not relevant to the first prong of Plaintiffs' Eighth Amendment claim. See, e.g., Martin v. Ward, No. 1:18-cv-4617-MLB, 2021 WL 1186749, at *5 (N.D. Ga. Mar. 30, 2021) (finding information about the pharmacies and manufacturers of the lethal injection drug were relevant to the plaintiff's Eighth Amendment claim and within the scope of Rule 26).[6] Indeed, whether a manufacturer or supplier has had issues with the safety or purity of a drug seems relevant to whether using that drug would pose a substantial risk of serious harm. But the Court is not persuaded by Plaintiffs' argument that supplier or manufacturer information is relevant and necessary to establish a readily available alternative. Plaintiffs could themselves find out about their alleged alternative of pentobarbital by "simply creating a list of pharmacies and calling them to determine whether any would be willing to sell pentobarbital" to the FDOC. See Jordan v. Hall, No. 3:15CV295HTW-LRA, 2018 WL 1546632, at *11 (S.D. Miss. Mar. 29, 2019) (finding discovery request for supplier information unnecessary to show available alternative because information could be obtained by other means). Of note, "[t]he evidentiary burden is on [Plaintiffs] to show that 'there is now a source for pentobarbital that would sell it to the [FDOC] for use in executions.'" Arthur v. Comm'r, Ala. Dep't of Corr., 840 F.3d 1268, 1302 (11th Cir. 2016). Defendants are not required to show they cannot acquire said alternative.

---

[6] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

Despite the apparent relevancy of these requests, the Court finds compelling Defendants' argument that disclosing identifying information is not proportional to the needs of the case, especially considering that the burden of production outweighs its likely benefit. Courts have extensively discussed discovery requests for manufacturer and source information for lethal injection drugs and the states' interest in keeping that information confidential. See Jordan v. Comm'r, Miss. Dep't of Corr., 947 F.3d 1322, 1338-39 (11th Cir. 2020) (summarizing litigation in other circuits regarding disclosure of confidential information about a state's source for a drug used in executions). The Court recognizes Defendants have a strong interest in enforcing their sentencing laws and requiring Defendants to reveal the names of their suppliers, manufacturers, or pharmacies has resulted in the unavailability of drugs used in past lethal injection protocols. See Responses Ex. A; see also Grayson v. Warden, 672 F. App'x 956, 964 (11th Cir. 2016)[7] ("As this Court has noted many times, and the Supreme Court reiterated [ ], both pentobarbital and sodium thiopental are unavailable for use in executions as a result of the advocacy of death penalty opponents."). Also, while Florida's public records laws do not give rise to a federal evidentiary privilege, the Court can consider that manufacturers or suppliers may rely on those state laws as a necessary shield from harassment or threats in providing drugs to the FDOC, and it is well settled and acknowledged that "a drug supplier operating under a promise of confidentiality . . .

---

[7] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

probably will stop providing drugs altogether, once its identity is disclosed in litigation." Jordan, 947 F.3d at 1330.

The Court thus finds Defendants have established that the burden of disclosing the identities of the manufacturer, pharmacy, or source of the lethal injection drugs outweighs the likely benefit of that disclosure. See Fed. R. Civ. P. 26(b)(1). But because information about the sources' FDA-approval and the drugs' potency, efficacy, safety, stability, or consistency is relevant to Plaintiffs' claim, the Court concludes that Defendants must respond to these requests without disclosing critical manufacturer or source identification information. While the Court rejects Defendants' assertion that Plaintiffs' counsel might violate a protective order or engage in harassment tactics themselves, it recognizes that even with the most stringent protective order in place, there is always a risk of an unintentional disclosure. See Martin, 2021 WL 1186749 at *8; see also In re Missouri Dep't of Corr., 839 F.3d 732, 737 (8th Cir. 2016) (finding protective order to limit disclosure of Missouri lethal injection drug supplier not a satisfactory solution in lethal injection litigation). But, as Plaintiffs propose, documents and information related to how the drugs are manufactured or created can be redacted to provide relevant information about purity and efficacy without disclosing identifying information of the source. The Court is confident that the parties can negotiate a way by which Plaintiffs may obtain relevant information without compromising Defendants' ability to carry out their duties. Thus, the Motions to compel responses to these requests are **granted to the extent that Defendants must provide the relevant information, as stated herein, with appropriate redactions**.

> **B.      Lot numbers, quantities, expiration dates, logs, and inventories:**
> (interrogatories 2, 6, 9); (requests for production 1, 2, 8, 11)

In interrogatories 2, 6, and 9, Plaintiffs ask for information about the "lot numbers, quantities, and expiration dates of the three lethal injection drugs presently available for use" by the FDOC. Motions at 16-19. In request for production 1, they ask for all documents regarding the quantity and expiration dates of the three drugs. Id. at 31. In request for production 2, they request a complete inventory of the drugs used in carrying out executions. Id. at 32. And in requests for production 8 and 11, they seek copies of all logs about the receipt, use, and disposal of the lethal injection drugs and all documents relating to the disposition of all expired lethal injection drugs in the FDOC's possession between September 1, 2013 and today. Id. at 44-45. Plaintiffs assert the information sought in these requests is necessary to "ascertain whether the [F]DOC has sufficient quantity of [unexpired] drugs as established in the Protocol" to carry out Plaintiffs' executions and "whether [F]DOC actually has the correct drugs as written in the protocol." Motions at 16-17, 34, 44. They also assert this information is relevant because "expired drugs are both less potent and less effective," and "lot numbers shed light on whether [] Defendants are using legitimate FDA sources for the drugs" or if any drug has faced recall. Id. at 17, 34-35.

According to Plaintiffs, Defendants object to this request because "the information involves sensitive data that would render it more difficult for [F]DOC to obtain the drugs." Motions at 19. But Plaintiffs contend any sensitive information can be redacted before disclosure. Id. at 37. They also assert Defendants' objection is disingenuous because they provided this information – lot numbers, quantities, and expiration dates of lethal injection drugs – to third parties through public records requests. Id. In support of that statement, Plaintiffs attach the FDOC's June 2016 letter to the Tampa Bay Times,

producing quantity logs of available drugs and expiration dates for drugs in the prior protocol, and the FDOC's November 2018 letter producing receipts and invoices showing quantity, expiration dates, and lot numbers of lethal injection drugs purchased by the FDOC. See Motions Exs. 1, 2.

Defendants object to disclosure of this information because "the protocol specifies the amount of drugs necessary to successfully complete an execution, and Defendants and members of the execution teams are presumed to carry out their duties in a good faith manner." Responses at 12. They also argue this information is not relevant to Plaintiffs' claim because "there is no warrant signed to execute Plaintiff[s]," so "the amount of drugs that [the] FDOC currently has and their respective expiration dates will not reveal whether there will be a sufficient amount of drugs for Plaintiff[s'] execution[s]." Id. at 12.

The Court finds that Plaintiffs have adequately shown this requested information is relevant to their Eighth Amendment claim, and Defendants have not shown that their burden in disclosing the information outweighs its relevancy. Record evidence shows Defendants have provided some of this information to the media and the public through routine public records requests. As such, the Motions to compel responses to these requests are **granted, as limited by Plaintiffs' agreement that Defendants may redact sensitive information prior to disclosure**.

    **C.**    **Packaging-related documents of lethal injection drugs**: (requests for production 9, 10)

In request for production 9, Plaintiffs ask for "photocopies of all packaging, labels, instructions, and documents that adorn or accompany the lethal injection drugs' containers as received from any third party and as currently in possession of FDOC." Motions at 46. In request for production 10, they ask Defendants to "produce package

16

inserts for the lethal injection drugs currently in FDOC's possession and copies of all writings on the packaging containing the lethal injection drugs currently in FDOC's possession." Id. According to Plaintiffs, these documents are relevant because packaging inserts and labels contain dosage, side effects, warnings, strengths, and drug interactions, which is information that can reveal added harms to Plaintiffs during execution. Id. at 47. Plaintiffs contend that if these inserts and packages contain supplier information, they concede to Defendants producing redacted versions. Id.

Defendants argue that "packaging, labels, instructions, and documents for the lethal drug's containers" are irrelevant and "may reveal sensitive supplier information." Responses at 14. As to Plaintiffs' request for package inserts for the three drugs, Defendants assert Plaintiffs' Eighth Amendment challenge is focused only on the use of etomidate, and thus package inserts for the other two drugs for the three-drug protocol are irrelevant. Id. In support of that contention, Defendants cite Asay v. State, 224 So. 3d 695 (Fla. 2017), in which the state trial court ordered them to provide the package insert for etomidate. Id. at 14 (citing Asay, 224 So. 3d at 701).

Initially, the Court notes that Defendants do not seem to dispute Plaintiffs' argument that, at the very least, the packaging and any accompanying insert for etomidate may be relevant to Plaintiffs' claim. But despite that concession, Defendants have not provided the insert documents for etomidate to Plaintiffs. See Replies at 12. And Defendants make no argument that their burden in disclosing the requested information outweighs Plaintiffs' right to this discovery. The Court is also not persuaded by Defendants' argument that the requested documents for the other two drugs are irrelevant. Indeed, contrary to Defendants' insinuation that the state trial court in Asay

ordered the FDOC to only produce packaging-related documents for etomidate, the state trial court also ordered the FDOC to produce packaging-related documents for rocuronium bromide and potassium acetate. See Asay, No. 16-1987-CF-006876. As such, the Motions to compel responses to these requests are **granted to the extent that Defendants must produce the requested information with appropriate redactions**.

D.    **Lethal injection team and records**: (interrogatories 13, 14)

In interrogatory 13, Plaintiffs seek information identifying each individual involved in adopting and following these measures in the last seven executions: (a) tenting a sheet over the prisoner, including covering the prisoner's feet; (b) covering/taping the hands and fingers of the prisoner; and (c) changing the position of the prisoner so the witnesses are viewing his feet rather than a side view. Motions at 27-28. According to Plaintiffs, these procedures were seen in the last "seven executions" but were not part of the written protocol. Id. at 28. They assert discovering the identity of the people who made these changes is relevant to "shed light on [ ] Defendants' process of revising the protocol without including the revisions in the written protocol." Id. They argue this information relates to their argument that Defendants' protocol is unconstitutional because it is a "rolling protocol" and they "make up and add steps ad hoc." Id. They contend these changes suggest the FDOC takes measures to obscure the witnesses from viewing what is happening to the prisoner during the execution and may show the FDOC knows about "the inadequacy, pain, and problems with the use of the drugs in the" protocol. Id. at 28-29.

Defendants argue that identifying the individuals responsible for adopting these "measures" would neither be relevant to Plaintiff's claim nor their theory that the written protocol is changed "ad hoc." Responses at 15-16. Defendants explain that the written

protocol states that the list of tasks taken in preparation of the execution "is not intended to be exhaustive [as] [t]here may be other necessary tasks to carry out an execution and such tasks will be assigned by the team warden." Id. at 16. They also assert that any alleged "change" in the direction of an inmate's body position does not amount to a change to the written protocol as the written protocol does not specify the position or direction of the inmate's body during execution. Id. at 16-17.

This Court agrees with Defendants. The relevancy of this requested information is weak at best. Plaintiffs do not allege that the positioning of an inmate's body or the covering of an inmate's hands and feet during execution would pose a substantial risk of serious harm to Plaintiffs in violation of the Eighth Amendment's proscription against cruel and unusual punishment. And they do not assert these "measures" establish they will suffer unnecessary pain during the execution. Instead, Plaintiffs seemingly argue that this information is relevant to show the FDOC's attempt to "obscure" the witnesses' view of the execution or show that the FDOC knows of problems with the lethal injection drugs. But this is pure speculation and the information is only marginally relevant, at best, to Plaintiffs' claims. While Plaintiffs' Complaints allege that the current protocol does not require training for execution personnel charged with carrying out specific lethal injection tasks, Plaintiffs do not allege changes in the inmate's body placement relate to inadequate training or any other alleged insufficiency in the written protocol. As such, the Motions to compel responses to that request are **denied**.

In interrogatory 14, Plaintiffs seek information identifying each person involved in training the execution team, their qualifications, and the subject matter for which they are responsible for training the execution team. Motions at 30-31. According to Plaintiffs,

since the written protocol "does not require the execution personnel to understand the potential side effects and general properties of etomidate when conducting a consciousness check, the training involved in such checks, including the qualifications of the individual who trains the execution team to perform the consciousness check," is relevant to Plaintiffs' Eighth Amendment claim. Id. at 31. They assert that any lack of or insufficient training would exacerbate the already substantial risk of harm associated with the side effects of etomidate or its short-acting qualities. Id.

Defendants "object to providing any additional information beyond what has been provided in the protocol." Responses at 17. According to Defendants, the protocol states that all team members are instructed on the effects of each lethal injection drug and requires team members to participate in training simulations. Id. at 17-18. They assert Plaintiffs' request is overbroad and irrelevant because the possibility of a mistake or accident during an execution does not render the procedure unconstitutional. Id. at 19. Defendants also argue that the state has an important interest in keeping this identification information confidential. Id. at 20. They assert information related to the identity of the execution team members is confidential under section 945.10(1)(g). Id. at 20. They explain that the team warden conducts the training simulations and has the decision-making authority in every aspect of the process and the team warden is a protected member of the team. Id.

The Court finds Plaintiffs' request for information, outside the written protocol, about training the execution team, including training on the nuances of etomidate and its potential effects, is relevant to Plaintiffs' Eighth Amendment claim. But Plaintiffs' claim does not depend on the identity of a specific individual, and they do not need the names

of the individuals who train the execution team to obtain this information. Defendants have shown a need to protect the identities of training personnel, but they have not shown a need to completely withhold general information about how the execution team is trained. As such, the Motions to compel a response to this request are **granted only to the extent that Defendants must produce general information about the execution team training while redacting personal, identifying information about execution team members**. See, e.g., Martin, 2021 WL 1186749, at *9 (deciding the defendant did not show good cause for complete withholding of documents obtaining relevant information about training the execution team members and finding that redacting identifying information struck an appropriate balance); see also Cooey v. Strickland, No. 2:04-cv-1156, 2009 WL 4842393, at *2 (S.D. Ohio Dec. 7, 2009) (ordering that the names of execution team members be protected by referring to each member using an assigned number).

      **E.**    **Identity of person responsible for maintaining the supply to lethal injection drugs and licenses and registrations**: (interrogatory 4); (request for production 3)

In interrogatory 4, Plaintiffs ask for identifying information for the person or people in the FDOC pharmacy who are responsible for maintaining the supply of lethal injection drugs. Motions at 22-24. They assert this information is relevant "to establishing whether the drugs are properly stored[] and transported, which in turn determines their stability, potency, and efficacy," ultimately affecting whether Plaintiffs are subject to a substantial risk of serious harm. Id. at 23.

Defendants object to the request and argue the individual who maintains the drugs is considered a member of the execution team as contemplated under section 945.10(1)(g), and thus Defendants and the FDOC have a great interest in protecting said

individual's identity and ensure that person is safe from harassment and threats. Responses at 21-22. Defendants also assert that information about how the drugs are maintained is not relevant because Plaintiffs do not allege the drugs are illegally obtained or improperly stored. Id. at 22-23.

Again, the existence of a Florida statute prohibiting disclosure of identifying information does not, by itself, give rise to a federal privilege. But those state privacy interests and confidentiality concerns can factor into the Court's resolution of discovery disputes. See Jordan, 947 F.3d at 1336. To that end, while the Court finds that information about how the FDOC stores and maintains the lethal injection drugs is relevant to Plaintiffs' Eighth Amendment claim, the Court does not find that the identities of the individuals who store those drugs are relevant. As such, the Motions to compel a response to this request are **granted only to the extent that Defendants must provide general details about the FDOC's maintenance and storage of the execution drugs with appropriate redactions**. See King v. Parker, No. 3:18-cv-01234, 2020 WL 4883014, at *8 (M.D. Tenn. July 20, 2020) (granting the plaintiff's request to compel disclosure of the defendants' practices for storage of execution drugs but prohibiting discovery of the identities or identifying information about individuals involved in maintaining the drugs); Martin v. Ward, No. 1:18-cv-4617-MLB, 2021 WL 1186749, at *5 (N.D. Ga. Mar. 30, 2021) (finding information about how lethal injection drug is "created, stored, and transported" relevant and discoverable).

In request for production 3, Plaintiffs seek copies of all local, state, and federal licenses or registrations held by the FDOC or any FDOC employee authorizing the procurement, purchase, possession, or transfer of pharmaceuticals. Motions at 38-40.

They contend this information is relevant to the FDOC's ability to obtain feasible alternative drugs, including the FDOC's ability to compound drugs and the potency and efficacy of any potential compounded drug. Id. at 39. According to Plaintiffs, this information is also relevant to ensure the FDOC obtained the execution drugs legally, addressing concerns about whether the drugs meet quality and efficacy standards and showing whether the FDOC is willing to deviate from its own protocol. Id. at 39. Plaintiffs explain Defendants' wholesale objection to this request is erroneous as the FDOC has produced these documents in response to public records requests and attaches the FDOC's November 2018 letter producing several redacted DEA licenses for correctional pharmacies. Motions at 40; Motions Ex. 2.

In their initial objection to this request, Defendants argued "to reveal particular employment, certifications, or licenses may provide sufficient information for a party to discover the identity of a team member," which is prohibited. Motions at 39. In their Responses, Defendants again object to this request and make a conclusory argument that Plaintiffs fail to explain how these documents are relevant to their Eighth Amendment claim. Responses at 23. The Court disagrees with Defendants' blanket refusal. Plaintiffs have adequately explained the relevancy of this request, and Defendants have not shown a need to completely withhold these documents. The redaction of identifying or confidential information is appropriate to protect Defendants' interests. Indeed, Defendants have produced redacted copies of the FDOC's DEA registration certificates, several invoices, and receiving logs for particular drugs. See Motions Ex. 2. As such, the Motions to compel a response to this request are **granted such that Defendants must**

**produce the requested documents with appropriate redactions**. See, e.g., Martin, 2021 WL 1186749, at *9.

> **F.    Information related to the lethal injection protocol**: (interrogatory 11, 12); (requests for production 14, 15, 16, 17, 18, 19, 23, 24)

In these requests, Plaintiffs seek information and documents related to the development, drafting, and approval of the January 4, 2017, and February 27, 2019, written lethal injection protocols. Motions at 24-27; 49-54. Plaintiffs ask for the identity of "each person who participated in drafting, developing, reviewing, or approving revisions to the January 4, 2017, and February 27, 2019, lethal injection protocols and specify each person(s) responsibility." Id. at 24-27. They also request a chronological "description of each significant event in developing, drafting, reviewing, and approving the January 4, 2017, and February 27, 2019, written protocols, including meetings, conferences, consultations with experts, contact with pharmacy departments of Florida colleges, memoranda, or correspondence, by each person whose approval was required; and identify the persons involved." Id. at 25. Plaintiffs also ask for copies of all documents and communications the FDOC relied on in deciding to change or substitute each of the three current lethal injection drugs for the former drugs, including all studies, reports, and communications with medical experts. Id. at 49-50. According to Plaintiffs, this information is relevant because they need to "investigate why these changes to the protocol were made, why alternatives were not chosen, and what science was relied on to make these changes." Id. at 26, 51. They contend information about the Etomidate Protocol's development is important to determine whether the FDOC made these changes for convenience, cost, or desire to "superadd" pain or terror into the procedure and whether it considered but refused to adopt alternative, less painful methods. Id. at 52.

In response, Defendants explain they already relayed that former Secretaries "Julie Jones and Mark Inch were responsible for adopting and promulgating the Etomidate Protocol," and they should not have to provide anything more than the available written protocol. Responses at 24. They argue Plaintiffs' requests do not relate to any fact in determining their Eighth Amendment claim or whether the protocol presents a substantial risk of serious pain. Id. at 25. Instead, according to Defendants, "it does not matter how the protocol is derived: It matters how it works." Id. To that end, they contend these requests are irrelevant and disclosure of such information "has the potential to reveal sensitive supplier information as well as confidential information relating to the execution team." Id. at 26.

Initially, the Court notes that Plaintiffs' requests are seemingly moot because in May 2021, the Secretary issued another periodic recertification letter to Governor DeSantis along with the FDOC's updated written lethal injection protocol, which superseded the FDOC's February 2019 written procedure. See Certification Letter from Sec'y Mark S. Inch to Governor Ron DeSantis (May 6, 2021) (available at www.dc.state.fl.us); see also Brant (Doc. 143-1); Davis (Doc. 59-1). Still, even if these requests are not moot, information and documentation about the FDOC's internal decision to change or substitute etomidate for midazolam, rocuronium bromide for vecuronium bromide, or potassium acetate for potassium chloride, including any medical reports and consultations contemplated by the FDOC before making those decisions, is irrelevant to Plaintiffs' Eighth Amendment claim. See Arthur v. Myers, No. 2:11-cv-438-WKW, 2015 WL 5093518, at *2 (M.D. Ala. Aug. 28, 2015) (finding the plaintiff's discovery request for information about the state's decision to change the first two drugs of its lethal

injection protocol, as well as the dosages, was irrelevant to the plaintiff's Eighth Amendment claim). Defendants explained that former Secretaries Jones and Inch selected the drugs and dosages to use in its current lethal injection protocol, and the reasoning behind the decisions is irrelevant to whether the protocol, in its current form, "presents a risk that is 'sure or very likely to cause serious illness and needless suffering."

Likewise, while Plaintiffs argue this information is relevant to the second prong of their Eighth Amendment claim – that the FDOC has allegedly refused to adopt an available alternative without a legitimate penological reason – the only alternative they propose in their Complaints is "a single dose of non-compounded or properly compounded pentobarbital." Plaintiffs have always had the burden of proving that element, "[b]ut that does not require Plaintiff[s] to establish that Defendants have independently researched [their] proposed alternative." King v. Parker, No. 3:18-cv-01234, 2020 WL 4883014, at *8 (M.D. Tenn. July 20, 2020). And "Plaintiff[s'] desire to discover details about Defendants' research is largely a matter of convenience." Id. As such, Plaintiffs' request for documents or communications regarding the FDOC's potential consideration of other, unspecified drugs is overly broad. Instead, a request for general information about the FDOC's consideration or efforts to obtain pentobarbital would be a more relevant approach. As such, the Motions to compel responses to these requests are **granted only to the extent that Defendants must produce documents and information about efforts to obtain pentobarbital or compounded pentobarbital, with appropriate redactions.**

**G.      The FDOC's written response to the Florida Board's Compounding Survey**: (request for production 4)

Plaintiffs request the FDOC's written response to the Florida Board of Pharmacy's November 27, 2012, "Compounding Survey." Motions at 40-41. They argue this survey, which had a mandatory response deadline of December 11, 2012, is relevant because it details the FDOC's compounding activities and the scope of its sterile and non-sterile compounding. Id. at 41. According to Plaintiffs, this information will show "the efficacy of any lethal injection drugs (if compounded) and any dangers resulting from such compounding, as well as the feasibility of any alternative drug . . . ." Id.

Defendants argue the FDOC's survey response is irrelevant because the survey was conducted several years ago, and Plaintiffs fail to explain how those dated answers relate to either the FDOC's current lethal injection practices or their Eighth Amendment claim. Responses at 27.

According to Plaintiffs' own statements, the FDOC submitted its written response to this survey four years before the FDOC adopted the Etomidate Protocol and seven years before filing their Motions. Plaintiffs do not explain how the FDOC's responses to that 2012 survey still apply to its present-day practices. Thus, the Court agrees that this request is irrelevant to Plaintiffs' Eighth Amendment claim. As such, the Motions to compel responses to this request are **denied**.

### H.   Lethal injection prescriptions: (request for production 6)

Plaintiffs request copies of any prescriptions the FDOC used or plans to use to obtain the lethal injection drugs, including the date(s) of purchase and the date(s) of receipt. Motions at 41-43. According to Plaintiffs, these documents are relevant because "[i]f the [F]DOC is using prescriptions to obtain its current drugs in the protocol, this would inform [of] its ability to acquire other feasible alternative drugs, including those available through legitimate compounding pharmacies." Id. at 42.

27

In their Responses, Defendants state "[n]o such documents exist. Nor would such documents be relevant to a cognizable Eighth Amendment claim." Responses at 28. Because the documents do not exist, the Motions to compel responses to this request are **denied**.

### I.   Communications and documents to obtain lethal injection drugs: (requests for production 12, 13)

Plaintiffs request all documents and communications, internal and external, about the FDOC's successful or unsuccessful attempts and efforts to acquire any of the lethal injection drugs between September 1, 2013, and today. Motions at 47-49. They assert this information is relevant to establish "whether the state has refused to adopt a feasible, readily implemented alternative drug without legitimate penological reason." Id. at 48. According to Plaintiffs, this information is also relevant to determine why Defendants chose the specific drugs used in the current protocol over alternative drugs and whether those alternative drugs were obtainable. Id.

Defendants object to these requests, arguing information about the FDOC's efforts to obtain any lethal injection drugs is irrelevant because Plaintiffs' Eighth Amendment claim depends on "how etomidate creates an unacceptable risk of pain, not why the state chose 'etomidate and what other choices were available.'" Responses at 28 (quoting Motions at 48). Defendants contend any analysis of the FDOC's refusal to change its protocol must be considered in light of the alternative Plaintiffs proposed in their Complaints and "[r]ecords relating to whether there was a different drug available to Florida within the past seven years that the [FDOC refused to adopt] in its protocol is not the standard." Id. at 31.

As discussed in section "F" above, the scope of Plaintiffs' request here is overly broad. As Defendants explain, the only relevant information about the efforts or attempts the FDOC made to obtain lethal injection drugs are those related to the alternative drug alleged in their Complaints – "a single dose of non-compounded or properly compounded pentobarbital." To that end, a request for general information about the FDOC's efforts to obtain pentobarbital since January 2017, when the FDOC implemented the Etomidate Protocol, is more appropriate to support their Eighth Amendment claim, not a demand for a decade of information and documents the FDOC generated about all potential drugs. See Arthur, 840 F.3d at 1304-05 (finding general description of the state's "efforts to obtain pentobarbital, including whether the pentobarbital was obtained and, if not, the reasons why it could not be obtained" was precisely what the plaintiff needed to prove his Eighth Amendment claim). However, the scope of that general information should not extend to the identity of suppliers, pharmacies, manufacturers, or other sources from which the FDOC has attempted to obtain pentobarbital. Thus, for these reasons, and the reasons detailed in section "F," the Motions to compel responses to these requests are **granted only to the extent that Defendants must produce documents and information about the FDOC's general efforts to obtain pentobarbital or compounded pentobarbital between January 2017 and today, with appropriate redactions.**

> **J.   Prior execution logs and documents and witnesses**: (requests for production 26, 28, 29, 30, 31)

Plaintiffs request documents related to the executions of Mark Asay, Cary Lambrix, Patrick Hannon, Eric Branch, Jose Antonio Jimenez, Bobby Joe Long (Robert Long), and Gary Ray Bowles. Motions at 54-60. In request 26, they ask for logs detailing the training

sessions for those seven executions, asserting this information is relevant to determine whether the FDOC is following training requirements. Id. at 54. They also acknowledge they have received "the actual execution logs" from the FDLE for these seven executions but have not received documents for the "practice or training sessions." Id. at 55 n.17. And they agree any information identifying the execution team members may be redacted. Id. at 54. Defendants argue Plaintiffs fail to explain how training session logs for other executions are relevant to their own, future executions. Responses at 32. They contend that Plaintiffs' argument that a lack of proper training could lead to a botched execution is speculative and any information they seek is in the written protocol, which details the requirements for staff training. Id. at 33-34. Defendants also assert that production of training logs would place an undue burden on them as such documents "contain confidential information identifying members of the execution team." Id. at 34.

The Court finds that information about the FDOC's general training of execution team members is relevant to Plaintiffs' Eighth Amendment claim. Specifically, discovery about how the team commonly trains for the consciousness assessment goes directly to Plaintiffs' allegation that etomidate is insufficient to render an inmate insensate to the other two lethal injection drugs. See, e.g., Arthur, 2012 WL 13187186, at *3 (granting the plaintiff's motion to compel additional deposition testimony about training execution team members). The Court also finds that discovery of the training logs for the executions of the seven listed inmates might be helpful and relevant to Plaintiffs' claim. As such, the Motions to compel responses to this request are **granted, as limited by Plaintiffs' agreement that Defendants may redact sensitive information**.

In requests 28 and 29, Plaintiffs request the list of witnesses who attended these seven executions and the list of all individuals who requested to witness each execution. Motions at 55. They also ask for the FDOC's guidelines or policies about who may witness an execution and if any deviations from those guidelines occurred during these seven referenced executions. They assert witness lists may lead to discovery of evidence about observed problems and preparation documents may show whether the FDOC deviated from its protocol. And they argue Defendants' objection to their request for witness lists is not made in good faith because, through public records requests, they have provided the media with witness lists for the executions of Gary Bowles and Robert Long, and Plaintiffs attach those two witness lists as exhibits to their Motions. See Motions Exs. 5, 6. Plaintiffs also contend that "to the extent this Court has concerns [with this disclosure], these can be addressed with a protective order." Motions at 56.

Defendants contend that any alleged deviation from the FDOC's witness policies would have no relevance to Plaintiffs' claim that the FDOC's deviation from the written lethal injection protocol creates a substantial risk of serious harm to Plaintiffs. Responses at 36. They also argue that while they have produced some witness lists to the media in response to public records requests, that fact does not permit Plaintiffs unfettered access to those documents, especially considering the lists may contain victim information. Id. at 37.

The Court finds the relevancy of Plaintiffs' requests for the witness lists of these seven executions and the FDOC's witness guidelines for executions is marginal at best. But Plaintiffs note, and Defendants admit, the FDOC has provided witness lists in response to public records requests. Plaintiffs also state that if the Court has concerns

31

with this disclosure, it may impose measures to protect sensitive information. While the Court finds a protective order is unnecessary at this time, it does believe redaction of identifying information or the names of victims' family members is appropriate. Thus, the Motions to compel responses to these requests are **granted to the extent that Defendants must produce the witness lists for these seven executions, with redactions of identifying information for victims' family members, and denied to the extent that Plaintiffs request Defendants to produce the FDOC's witness policies or guidelines**.

In request 30, Plaintiffs seek documents about preparations before those seven executions and "any instructions for any planned changes, additions, or deletions from established procedures." Motions at 56. According to Plaintiffs, such documents are relevant "because instances of the Defendants' failure to follow its protocol or make changes unreasonably and without notice bear on [their] ability or willingness to veer from its protocol in other respects"; and "Defendants' failure to strictly follow the protocol creates a substantial risk of serious harm to Plaintiff[s]." Id. at 57. In request 31, they ask for documents with debriefing information following those seven executions. Id. at 56-60. They argue debriefing documents will show difficulties or problems that occurred during these executions, such as venous access issues. Id. Plaintiffs concede that Defendants may redact identifying information that may be contained in these preparation or debriefing documents. Id. at 57, 60.

As to debriefing documents, Defendants explain they "have already produced FDLE observer logs for the [ ] seven executions, which provide a minute-by-minute account of all seven executions," and argue the written protocol outlines the procedure

for achieving venous access. Responses at 35. They contend any other documents relating to preparations or debriefings are not relevant and would contravene the state's interest in keeping execution members' identities confidential. Id.

Information about the preparation and debriefings for past executions is relevant to Plaintiffs' allegations that the FDOC's lack of training and routine practices exacerbate the substantial risk of serious harm Plaintiffs face with the Etomidate Protocol. See, e.g., King v. Parker, No. 3:18-cv-01234, 2020 WL 4883844, at *1 (M.D. Tenn. Aug. 13, 2020) (finding information about the preparations and procedures followed in past executions relevant to the plaintiff's Eighth Amendment method-of-execution claim). As such, the Motions to compel responses to these requests are **granted, as limited by Plaintiffs' agreement that Defendants may redact any identifying information.**

In light of the foregoing, it is hereby **ORDERED:**

1. As to Jackson, 3:14-cv-1149-MMH-JBT:

a. Plaintiff's Motion to Compel (Doc. 89) is **GRANTED IN PART AND DENIED IN PART**.

b. Within thirty (30) days of this Order, Defendants must produce the documents and answer the interrogatories as set forth in this Order.

c. Within ten (10) days of this Order, the parties shall confer and file a new proposed amended case management and scheduling order.

2. As to Anderson, 3:14-cv-1148-MMH-JBT:

a. Plaintiff's Motion to Compel (Doc. 85) is **GRANTED IN PART AND DENIED IN PART**.

b. Within thirty (30) days of this Order, Defendants must produce the

documents and answer the interrogatories as set forth in this Order.

c. Within ten (10) days of this Order, the parties shall confer and file a new proposed amended case management and scheduling order.

3. As to <u>Brant</u>, 3:13-cv-412-MMH-JBT:

a. Plaintiff's Motion to Compel (Doc. 132) is **GRANTED IN PART AND DENIED IN PART**.

b. Within thirty (30) days of this Order, Defendants must produce the documents and answer the interrogatories as set forth in this Order.

c. Within ten (10) days of this Order, the parties shall confer and file a new proposed amended case management and scheduling order.

4. As to <u>Davis</u>, 3:18-cv-353-MMH-JBT:

a. Plaintiff's Motion to Compel (Doc. 46) is **GRANTED IN PART AND DENIED IN PART**.

b. Within thirty (30) days of this Order, Defendants must produce the documents and answer the interrogatories as set forth in this Order.

c. Within ten (10) days of this Order, the parties shall confer and file a new proposed amended case management and scheduling order.

**Ordered** in Jacksonville, Florida, on January 2, 2024.

JOEL B. TOOMEY
United States Magistrate Judge

Jax-7

C:    counsel of record

34