**UNITED STATES DISTRICT**
**COURT MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**CHARLES G. BRANT, et al.,**

**Plaintiffs,**

**v.** **Case No. 3:13-cv-412-MMH-SJH**

**DAVID ALLEN, in his official capacity as the Warden of Florida State Prison, and RICKY D. DIXON, in his official capacity as the Secretary, Florida Department of Corrections,**

**Defendants.**
____________________________________/

**DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT T

Declaration of Dr. Robert J. Sneyd

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**ETHERIA V. JACKSON**

**Plaintiff,**

**v.** **Case No: 3:14-cv-1149- MMH-JBT**

**BARRY REDDISH, WARDEN, FLORIDA STATE PRISON**
**JULIE JONES, SECRETARY, DEPARTMENT OF CORRECTIONS,**

**Defendants.**

**EXPERT DECLARATION OF DR. J. ROBERT SNEYD**

1. My name is John Robert Sneyd. I am the Professor of Anesthesia and Dean of the Plymouth University Peninsula Schools of Medicine and Dentistry, The John Bull Building, Research Way, Plymouth Science Park, Plymouth PL6 8BU, UK. I trained at Cambridge University, UK and then in London and Manchester. I also worked at The University of Michigan, USA. My professional qualifications are BA, MA, MB, BChir, FRCA, MD, and SFHEA. A copy of my CV is attached.

2. I started my practice in anesthesia and intensive care in 1983 and continued anesthesia practice until 2016 and now focus on academic duties.

3. My research interests include drug development and clinical investigations, especially in intravenous anesthesia and analgesia. I was the Principal Investigator for the first human administration of several new sedative hypnotic agents. I am currently a Consultant Advisor for the following: Maruishi Pharmaceuticals, Japan; Altus formulations, Canada and Expanesthetics, USA.

4. I worked in the pharmaceutical industry in the mid 1980's and I have been involved in drug discovery and development programs ever since. I have 114 outputs listed on PUBMED as Sneyd_JR with others under Sneyd_J and Sneyd_R. The majority of these are original research publications with an emphasis on anesthetic pharmacology. I am an opinion leader in anesthetic pharmacology.

5. The information in this declaration is based upon my personal knowledge and sources of the type relied upon by researchers in my field. Having spent many years researching drug development, consulting with US pharmaceutical companies and teaching in the US, I am very familiar with the US FDA approval processes for New Drug Applications (NDAs) and Abbreviated New Drug Applications (ANDAs), both from an academic and practitioner perspective. I am making this declaration in my individual capacity, and my observations should not be interpreted as those of my employer or any other organization.

6. I have been asked by Plaintiffs to review Defendants' "Execution by Lethal Injection Procedures" dated January 4, 2017 (Hereinafter Etomidate Protocol) and to address the suitability of etomidate as an anesthetic in a three-drug lethal injection protocol, as well as to address the procedures regarding assessment of consciousness. I have been asked to address the re-positioning of the prisoner during the execution to determine if the positioning in any way impacts or obscures indications of consciousness. Finally, I have been asked to opine whether the use of the Etomidate Protocol as a whole creates a substantial risk of serious harm to Plaintiffs.

7. In formulating my opinion, I have reviewed the Etomidate Protocol, which calls for the use of etomidate, rocuronium bromide, and potassium acetate, as well as Defendants' prior protocol, the Midazolam Protocol, which called for the use of midazolam, vecuronium bromide, and potassium chloride. I have also reviewed eyewitness press reports of the executions of Eric

Branch and Patrick Hannon[1]; the affidavit of Richard Kiley, Esq., who has observed the executions of Martin Grossman, Darius Mark Kimbrough, and Eddie Wayne Davis; the affidavit of Neal Dupree, Esq., who has observed several executions; the affidavit of Robert Friedman, Esq., who observed the execution of Eric Branch; and the testimony of Warden Timothy Cannon in *State of Florida v. Paul Howell*, 1992-CF-22 (Second Judicial Circuit, Jefferson County). I regularly review scientific manuscripts for international academic journals including the top-ranked journal in the anesthesia sector, the British Journal of Anaesthesia (401 reviews) and the second and third ranked journals (Anesthesiology and Anesthesia and Analgesia). In this work I have reviewed manuscripts on etomidate and on new drugs derived from etomidate.

8. The Etomidate Protocol calls for 200mg of etomidate as the first drug in a three-drug protocol. Etomidate is an ultra-short acting anesthetic agent. The only available scientific studies of etomidate use a smaller quantity of the drug. As such, there is no available data to determine exactly how long a 200 mg dose of etomidate will last. It has not been shown that a higher dose of etomidate will have a proportionately greater or longer effect. It is also not the case that a higher dose of etomidate will necessarily produce an equal effect.

9. We do know that the etomidate execution of Mr. Branch took 17 minutes to complete (see Affidavit of Robert Friedman), and was accompanied by screaming and thrashing. This suggests that, even if unconsciousness was initially achieved, it did not persist through the administration of the paralytic and then the lethal agent, potassium acetate.

[1]*See* Jason Dearen, *Eric Branch lets out blood-curdling screams, yells 'murderers' as he is executed*, Pensacola News Journal (February 22, 2018) *available at* https://www.pnj.com/story/news/crime/2018/02/22/eric-branch-execution-escambia-county-inmate-pronounced-dead-lethal-injection-susan-morris/365474002/ and Jason Dearen, Florida executes man for pair of killings dating to 1991, Associated Press (November 9, 2017) *available at* https://apnews.com/0bbc2f048bc94fdd98ef41d0f9fb445c.

10. This is important because there is absolute certainty that a potassium acetate injection into a peripheral vein to an inmate conscious but paralyzed, would be extremely painful and inhumane.

11. Etomidate frequently produces pain upon injection, which ranges from moderate to severe. The descriptors "moderate" and "severe" are typically used in patient questioning described in published research studies seeking to quantify pain on injection.

12. Because the induction and maintenance of anaesthesia with etomidate is characterized by "involuntary movements" which range from minor twitching to myoclonus and sometimes substantial bodily movements, an untrained non-anaesthetist performing the executing will experience difficulty determining whether unconsciousness has been achieved.

13. The recent accounts of executions performed using the Florida protocol describe new positioning and sheeting to obscure most of the prisoner. Covering the prisoner and the new positioning prevent an adequate observation of movement, and create a difficulty in determining whether any movement is a product of consciousness or myoclonus.

14. Additionally, the assessment of consciousness as described in the Etomidate protocol is inadequate and has been conducted in an inconsistent manner. This consciousness check is to be conducted by the "team warden," who is not a medical professional. The method of assessment of consciousness is not specified. From the accounts of other executions, it has included some but not necessarily all of: touching the eyelids to look for a "lash reflex", picking the inmate up by the shoulders and shaking them, a "trapezius pinch", and pressure on the eye.

15. First, the loss of lash reflex has really fallen out of the mainstream assessment of the onset of unconsciousness.




16. Second, loss of eyelash reflex in response to a fixed dose of etomidate is highly variable and appears unreliable as a measure of onset unconsciousness. This graph (from Bispectral index changes following etomidate induction of general anesthesia and orotracheal intubation. M.-A. Lallemand C. Lentschener J.-X. Mazoit P. Bonnichon I. Manceau Y. Ozier. BJA: British Journal of Anaesthesia, Volume 91, Issue 3, 1 September 2003, Pages 341–346, https://doi.org/10.1093/bja/aeg175) shows the time to loss of the eyelash reflex in patients given three different doses of etomidate. The dose used in execution is 1-2 mg/kg.

17. With respect to holding the shoulders and shaking the prisoner, it is likely that someone who is shaken by the shoulders and head and who is completely unresponsive may be to some degree unconscious, though may not be actually fully anaesthetized as in "ready for surgery" and would be at risk of exposure to painful stimuli.

18. With respect to the trapezius pinch, this is not used in a clinical setting as a test of unconsciousness, but instead as a way of exploring the level of consciousness in somebody sedated or perhaps after head injury.

19. With respect to pressure on the orbit - where the skin runs over the bone just above the eye - the firm application of pressure from the examiner's thumb associated with some rubbing movement produces a reliably painful stimulus. Again, this would more usually be used as a test of degree of sedation, or perhaps after head injury, and would not be considered effective as a test of unconsciousness in a clinical setting. None of shaking/trapezius pinch/orbital pressure would routinely be used by anesthesiologists when assessing whether or not surgical anesthesia had been induced.

20. Finally, the lack of standardization of consciousness assessment is particularly problematic. The protocol is silent on how consciousness is to be assessed. This leaves it up to the team warden to improvise and creates a serious and substantial risk that indications of consciousness will be missed, leading to a painful and inhumane execution.

21. As such, based on the information that I have been provided thus far, it is my opinion to a reasonable degree of medical certainty that using the Etomidate Protocol creates a substantial risk of serious harm to Plaintiff.

22. If I were given additional information, such as pictures of the exact set up, an examination of the execution chamber, a video of the practice runs, a video of the actual execution, specifically including close pictures of all connections and tubings, more detailed logs of timing of delivery of the actual chemicals, expiration dates and storage conditions of drugs, training and experience of the person conducting consciousness check, I would be able to offer a more complete opinion. I reserve the right to amend this declaration if provided with any or all of these materials.

Pursuant to 28 U.S.C. Sec. 1746 I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Robert Sneyd

Dr. J. Robert Sneyd
E-mail: robert.sneyd@pms.ac.uk

Dated this 8th day of March, 2018.